CULLEY, et al. *v.* PEARL RIVER INDUSTRIAL COMMISSION.

No. 41071 January 12, 1959 108 So. 2d 390

*John C. Sullivan, Lee, Moore & Countiss,* Jackson, for appellants, Lewis L. Culley and Dr. Ben N. Walker, Jr.

*Avery & Putnam,* Jackson, for appellant, Hinds County, Mississippi.

796

*Watkins & Eager, Watkins, Edwards & Ludlam,* Jackson, for appellee.

798

ETHRIDGE, J.

This is an appeal from a final decree of the Chancery Court, First Judicial District of Hinds County, creating the Pearl River Valley Water Supply District (hereinafter sometimes referred to as District.) The District's purpose is to construct a large dam and water reservoir in the Pearl River Valley north of Jackson, Mississippi, covering lands in parts of five counties of the State. The issue on this appeal is whether the authorizing act, Senate Bill No. 1724, Miss. Laws 1958, is unconstitutional and void on its face and in the light of the record made in the trial court; or, conversely, whether the District was properly created by the final decree of the Chancery Court. Appellants raise five constitutional questions with reference to the statute which merit discussion. Their principal point is that the Act violates Sec. 17, Mississippi Constitution 1890, because, they assert, it empowers the District to acquire private property by condemnation, not for a public use, and then to rent, lease, or sell it for private use. We do not agree with that interpretation

of the statute, or the other assignments of error. We hold that the Act is valid, and affirm the decree creating the District.

I.

Chapter 169, Mississippi Laws 1956, created appellee, Pearl River Industrial Commission. The Governor was to appoint one member to the Commission from each of the five named counties, and such other counties as may elect to affiliate with the Comission. It was authorized to make a survey of the region bordering the Pearl River, and to investigate the possibilities of developing that area from an industrial, irrigational, and recreational standpoint, for the purpose of attracting new industries, conserving available water for irrigational and industrial purposes, protecting against pollution, and adopting a long-range plan of sewage disposal for the area. The Commission was to cooperate with the State Board of Water Commissioners. The Commission was financed in its activities from funds made available by each of the associated counties.

Pursuant to the directions of that 1956 Act, the Pearl River Industrial Comission employed Lester Engineering Company of Jackson, and Ebasco Services, Inc. of New York, an international engineering firm, to make a study of the engineering and economic feasibility of the proposal. That was done, and the lengthy report by these engineers was favorable.

On May 5, 1958, the regular legislative session enacted Senate Bill No. 1724 (Adv. Sh 13, p. 20), designated as the Pearl River Valley Water Supply District Act (hereinafter sometimes referred to as the District Act). This is a lengthy statute of some nineteen pages and thirty-three sections. In Sec. 2; the Legislature found that the waterways and surface waters of the state are among its basic resources. The preservation, conservation, storage and control of such waters are necessary in order to insure an adequate supply, to promote the balanced

economic development of the state, and to aid in flood control, conservation and development of state forests, irrigation of lands, and pollution abatement. Sec. 2 then states: "It is further determined and declared that the preservation, conservation, storage and control of the waters of the Pearl River and its tributaries and its overflow waters for domestic, municipal, commercial, industrial, agricultural and manufacturing purposes, for recreational uses, for flood control, timber development, irrigation and pollution abatement are, as a matter of public policy, for the general welfare of the entire people of the state.

"(b) That the creation of the Pearl River Valley Water Supply District is determined to be necessary and essential to the accomplishment of the aforesaid purposes and that this Act operates on a subject in which the state at large is interested. All the terms and provisions of this Act are to be liberally construed to effectuate the purposes herein set forth, this being a remedial Act."

The Act authorized the creation of the Pearl River Valley Water Supply District, as an agency of the State. Its Board of Directors is composed of the present members of the Commission during their present term, a member selected by the Board of Supervisors of each county which becomes part of the District, and one director appointed separately by the Board of Water Commissioners, State Game and Fish Commission, Forestry Commission, and State Board of Health.

The Pearl River Industrial Commission was directed to petition the Chancery Court of the First Judicial District of Hinds County to organize and establish the District. The petition must show the counties to be included, the engineering feasibility of constructing a dam and reservoir, its necessity and desirability, and the general description of the purposes of the contemplated works, including the lands to be overflowed or affected. The " 'project area' shall mean the physical location of

the reservoir, dam and related facilities as shown on the plats filed with the Chancery Court and shall include and be limited to an area of one (1) mile from the shore line of the reservoir at high water. The words 'related facilities' as used in this Act shall mean the facilities indicated on said maps or plats filed with the Chancery Court or otherwise explained in the pleadings filed with the Chancery Court and shall include property, land or areas of land, adjacent to, or in the vicinity of, said reservoir or dam and within a distance of one (1) mile from the high water mark of the proposed shore line of said reservoir as shown on said map, which may be acquired, owned, rented, leased or sold by the District in connection with the recreational or industrial development and use of the Project.''

The defendants shall be each county named in the petition, the State Board of Water Commissioners, and any municipality having a population of over 10,000, which in this District applies alone to the City of Jackson. Sec. 5 (d). Process by a publication and by posting notices of the hearing of the petition must be had in each of the counties affected. Sec. 6. The chancery court would then set a date for the hearing. Sec. 7. Sec. 8 provides: ''If upon the hearing of such petition, it is found that such project is feasible from an engineering standpoint and practical, and if the creation of the water supply district under the terms of this Act would meet a public necessity both local and statewide and would be conductive to the public welfare of the state as a whole, such court or chancellor shall so find and shall make and enter an order upon the minutes of the said chancery court stating that the said district to be known as the Pearl River Valley Water Supply District, should be organized subject to all of the terms and provisions of this Act.''

Following this final decree, the chancellor must then order an election in each county in the proposed District, with the required notice thereof. A majority of the quali-

fied electors voting shall determine whether the county becomes a part of the District. After report of the elections to the chancery court, that court shall then enter a final order including the counties so electing within the District. Sec. 9.

Sec. 11 of Senate Bill No. 1724, which grants to the District its essential powers, is the principal section involved on this appeal. The District is empowered to impound overflow and surface water of the Pearl River or its tributaries within the project area by the construction of a dam, reservoir and related facilities, to control, store and preserve the waters, and to use, distribute and sell them. It has the power to construct within the project area all works, plants or other facilities necessary or useful to the project, for processing such water and transporting it, for domestic, municipal, commercial industrial, agricultural and manufacturing purposes.

Subsection (e) of Sec. 11 grants this power: "to acquire by purchase, lease, gift or in any other manner (otherwise than by condemnation) and to maintain, use and operate any and all property of any kind, real, personal or mixed, or any interest therein within the project area, within or without the boundaries of the District, necessary for the project and convenient to the exercise of the powers, rights, privileges and functions conferred upon the District by this Act;".

Subsection (f), Sec. 11, describes other delegated powers and their limitations: "To acquire by condemnation any and all property of any kind, real, personal or mixed, or any interest therein, within the project area not exceeding one quarter mile from the outside line of the 300 foot above sea level contour on each side of Pearl River except as provided for rights of way under Subsection (g) of this section, within or without the boundaries of the District necessary for the project and the exercise of the powers, rights, privileges and functions conferred upon the District by this Act, according to the procedure

provided by law for the condemnation of lands or other property taken for rights of way or other purposes by railroads, telephone or telegraph companies. . . . The amount and character of interest in land, other property and easements thus to be acquired shall be determined by the Board of Directors and their determination shall be conclusive and shall not be subject to attack in the absence of manifold abuse of discretion or fraud on the part of such Board in making such determination. . . . Provided further that where any site or plot of land is to be rented, leased or sold to any person, firm or corporation for the purpose of operating recreational facilities thereon for profit, then the Board shall, by resolution, specify the terms and conditions of such sale, rental or lease, and shall advertise for public bids thereon. When such bids are received, the same shall be publicly opened by the Board, and the Board shall thereupon determine the highest and best bid submitted, and shall immediately notify the former owner of such site or plot of the amount, terms and conditions of such highest and best bid. Such former owner of such site or plot shall have the exclusive right at his option, for a period of thirty (30) days after the determination of the highest and best bid by the Board, to rent, lease or purchase said site or plot of land, by meeting such highest and best bid, and by complying with all terms and conditions of such renting, leasing or sale, as specified by the Board; provided, however, the Board shall not in any event, rent, lease or sell to any former owner more land than was taken from such former owner for the construction of the project, or one-quarter mile of shore-line, whichever shall be the lesser. If such option is not exercised by such former owner within said period of thirty (30) days, then the Board shall accept the highest and best bid submitted."

Subsection (v) of Sec. 11 grants this power: "Subject to the provisions of this Act, from time to time to lease, sell or otherwise dispose of any property of any kind,

real, personal or mixed, or any interest therein, within the project area or acquired outside the project area as authorized in this Act, for the purpose of furthering the business of the District.''

Under Subsection (w) of Sec. 11, the Board of Directors of the District has the power to sell lands on competitive bids when not necessary to the carrying on of the District's business, with a 30-day option in the former owner to meet the best bid.

Subsection (x) states: ''Any bona fide, resident householder, actually living or maintaining a residence on land taken by the District by condemnation shall have the right to repurchase not exceeding forty (40) acres of his former land or other available land from the Board of Directors for a price not exceeding the price paid for condemning his land.''

Sec. 13 provides: ''The Pearl River Valley Water Supply District is authorized to establish or otherwise provide for public parks and recreation facilities, and for the preservation of fish and wildlife, and to acquire land otherwise than by condemnation except as provided in Section 11 (f) for such purposes, within the project area.''

The remainder of the Act establishes procedures for making construction contracts, the issuance of bonds, financing, amortization of bonds, and related matters. Bonds issued pursuant to Act shall not exceed $25,000,-000 in principal amount. Sec. 19. Their amortization is to be financed by anticipated revenues from the project, and by two mills of the four mill state ad valorem tax collected in each county within the District, which were allocated and designated by the Legislature for the District. Sec. 16. In the event these sources of revenue are insufficient to meet authorized fixed charges, the District is empowered to levy annually a special tax not to exceed two mills upon all of the taxable property within the District. Secs. 20, 17.

## II.

On June 6, 1958, pursuant to the provisions of Senate Bill 1724, appellee, Pearl River Industrial Commission, filed in the Chancery Court a petition for creation of the Pearl River Valley Water Supply District. The petition as amended proposed to include in the District the Counties of Hinds, Rankin, Madison, Leake and Scott. It alleged in detail the Commission's conclusions as to the desirability and feasibility of the construction of a dam, reservoir, and appurtenant facilities on the Pearl River, the other necessary and basic facts required for the petition by Senate Bill 1724. Process was had on the counties in the District and the Board of Water Commissioners. Process by publication was also made as required by the Act. On July 24, 1958, a lengthy hearing was had before the Chancery Court.

Location of the dam will be in the northern part of Hinds and the southern part of Madison Counties. Average height of the dam will be thirty feet, its maximum height, fifty-nine feet. It will be 16,500 feet long, slightly over three miles. Normal pool level will be at contour 297 feet above sea level, with a maximum inundation at 300 feet above sea level. Overbank inundation at contour 297 is twenty miles up river from the dam; underbank inundation is fourteen miles further up river. So the reservoir will constitute a body of still water for a distance of thirty-two to thirty-four miles north of the dam. Next to the dam the lake will be three miles wide and thirty feet deep, diminishing in varying amounts at points further up river. At contour 297 feet above sea level, 37,000 acres of land will be covered by water in the reservoir. At the maximum 300 feet contour, 43,000 acres will be covered. The dam will have a spillway designed to pass the maximum anticipated flood flow. Estimated cost is $24,200,000. Design and materials for this earthen dam will be similar to those incorporated in the several large flood control reservoirs

constructed by the Federal Government in North Mississippi. The entire cost of this project will be borne by the counties in the District and by the State. No federal funds are involved.

The testimony by experienced reservoir engineers, water control authorities, and the head of the State Board of Health is undisputed that, in order for the reservoir to fulfill its purposes, it is necessary that the District have control of the marginal or perimeter lands around the shores. It is necessary for purposes of access, operation and maintenance of the project, protection of the District from liability for property damage, to prevent erosion and silting, to prevent pollution of the reservoir, and to preserve the water supply elements in it.

The Pearl River in its low stages creates a serious problem from Madison County to the Gulf of Mexico. The proposed reservoir will maintain a substantially increased flow of water all the way to the Gulf, thereby benefitting all of the area near the river to the Gulf. A water engineer for the State Board of Water Commissioners also said that it will help maintain and increase underground water supplies for distances as far removed as Greenville. The reservoir will assist materially in removing the present gross pollution of the Pearl River south from Jackson. By releasing flood waters in dry seasons, fifteen times as much water will be passed down stream in the river than it now has in dry seasons. No water is now available in Pearl River for industrial use during the long dry seasons of the year. Heavy industry requires tremendous quantities of water. Moreover, one-fourth of the population of the State will be within fifty miles of the reservoir.

The executive officer of the State Board of Health testified that control of a band of land around the reservoir was necessary for health purposes, in order that the water could be used for domestic consumption.

The City of Jackson, which now obtains its water from Pearl River, has a serious problem in obtaining an

adequate water supply. The reservoir would fulfill that need. The City has a contract with the District to pay it $500,000 per year for water from the reservoir.

For these and other reasons reflected in the record, it is manifest that the proposed reservoir will be unique in this State, considering the geology, density of population, existing stream pollution, existing health hazards to a large population, inadequate flow in dry seasons for industrial use, and over all benefits.

The undisputed and the overwhelming evidence shows that the dam and reservoir are feasible from an engineering standpoint and practical, the creation of the District would meet a public necessity, both local and statewide, and would be conducive to the public welfare of the State as a whole. The chancery court so found, and entered its decree of July 25, 1958, adjudicating that the District should be organized under Senate Bill 1724. It ordered elections to be held on August 26 in the five counties constituting the District, which resulted in large majorities in favor of the District in each county. On September 5, 1958, the chancery court entered its final decree creating the District, and adjudicating the facts required by Sec. 8. This appeal is from that decree.

Appellants Culley and Walker are landowners within the District who contested its creation by the trial court. Appellant Hinds County, which the statute required to be made a party-defendant, states that it is in favor of the project, but is appealing in order to determine the basic constitutional questions. Appellants do not contend that the evidence does not support the findings of facts by the chancery court, which held that the project is feasible, would meet a public necessity both local and statewide, and would be conducive to the public welfare of the State as a whole. Appellants offered no evidence to the contrary. The undisputed evidence supports those findings by the trial court.

## III.

■■ Appellants assert that the District Act violates Miss. Constitution Sec. 33 by conferring on the judiciary the authority to decide legislative questions. For that reason, they say, the creation of the District is void because based upon an unconstitutional delegation of legislative power. Miss. Const. Secs. 1, 2, 33, 144. Sec. 8 provides that, if upon the hearing the chancery court determines the project is feasible from an engineering standpoint and practical, creation of the District would meet a public necessity, both local and statewide, and would be conducive to the public welfare of the State as a whole, the court shall organize the District.

The dividing line between a legislative and a judicial act is often imperceptible. Traditionally, the Legislature may delegate to a court the power to determine whether certain facts exist which would warrant creation of the District. The findings of fact are conditions to its creation. The findings required of the chancery court by Sec. 8 are essentially factual in nature, involving, we think, findings of ultimate facts. The statute creates a judicial procedure to determine whether these circumstances and conditons exist. That determination is a function properly exercised by the chancery court. 16 C. J. S., Constitutional Law, Sec. 139. Somewhat similar is the action of the chancery court in passing on the validity of an extension of municipal limits. Ritchie v. City of Brookhaven, 217 Miss. 860, 65 So. 2d 436 (1953). The statute providing for creation of drainage districts by chancery decree is also analogous. Miss. Code 1942, Sec. 4584.

## IV.

■■ Appellants also argue that the Act is a local and not a general law, and therefore violates Miss. Const. Sec. 90, Pars. (1), (m), (q), (r), and (u): "The legislature shall not pass local, private, or special laws in

any of the following enumerated cases, but such matters shall be provided for only by general laws, viz: . . . (1) Laying out, opening, altering, and working roads and highways; (m) Vacating any road or highway, town plat, street, alley, or public grounds; . . . (q) Relating to stock laws, water-courses, and fences; (r) Conferring the power to exercise the right of eminent domain, or granting to any person, corporation, or association the right to lay down railroad tracks or street-car tracks in any other manner than that prescribed by general law; . . . (u) Granting any lands under control of the state to any person or corporation.''

Sec. 5 (a) provides that the counties which may be included in the District constitute ''any county through which the Pearl River runs or which borders on the Pearl River.'' There are thirteen counties out of the eighty-two in the State which fall within this classification. We think it is valid. The prohibition of local and private laws by Sec. 90 does not prevent a reasonable classification by the Legislature which has some reasonable basis in fact. And a law is general and uniform if it operates on every person who is brought within a valid classification. The facts show that the Pearl River is in a unique position in this respect. It is capable of serving a large proportion of the State's population, and, under the geological, health, industrial, recreational, and water-supply facts pertinent to it, the Pearl River presents a situation which justifies the classification made by the Legislature in Senate Bill 1724. We do not think the statute violates any of the provisions of Miss. Constitution Sec. 90.

A state may classify persons and objects for the purpose of legislation. In fact, all legislation involves classification to some extent. Classification under Const. Sec. 90 must be reasonable, and must be based on proper and justifiable distinctions. 12 Am. Jur., Constitutional Law, Sec. 476. It is competent for the Legislature to

determine upon what differences a distinction may be made for the purpose of statutory classification, although of course such power cannot be exercised arbitrarily and the distinction must have some reasonable basis. Ibid., Sec. 482. On this record we cannot say that there is no reasonable basis for the classification adopted by the Legislature in authorizing creation of the District. The facts amply warrant a conclusion that the Pearl River Valley constitutes an area of the state which, because of the economic, population, geologic and water-supply factors, supports the classification adopted.

## V.

■■ ■ Miss. Const. Sec. 81 states: ''The legislature shall never authorize the permanent obstruction of any of the navigable waters of the state, but may provide for the removal of such obstructions as now exist, whenever the public welfare demands. This section shall not prevent the construction, under proper authority, of drawbridges for railroads, or other roads, nor the construction of booms 'and chutes' for logs in such manner as not to prevent the safe passage of vessels, or logs, under regulations to be provided by law.''

Appellants assert that the District Act violates Const. Sec. 81 by authorizing the construction of a dam and reservoir on the Pearl River, which will create a permanent obstruction to one of the navigable waters of the State.

■■ ■ Miss. Code Secs. 686 and 8414, which were enacted after the Const. of 1890, define as ''navigable waters'' all ''rivers, creeks and bayous . . . twenty-five miles in length, and having sufficient depth and width of water for thirty consecutive days in the year to float a steamboat with carrying capacity of two hundred bales of cotton.'' This rather quaint definition of ''navigable waters'' was enacted after Sec. 81 was adopted. The terminology of Sec. 81 is to be construed in accordance with the meaning of the phrase ''navigable waters'' at the

time the Constitution was adopted. It was then well-established that a river "is navigable in the technical sense as high up from its mouth as the tide flows." Morgan v. Reading, 11 Miss. 366 (1844). This was the common-law definition, which had no reference to capacity for navigation, but referred to those waters in which all nations had the right of free navigation. Magnolia v. Marshall, 39 Miss. 109 (1860); State ex rel. Rice v. Stewart, 184 Miss. 202, 184 So. 44, 185 So. 247 (1939). What "navigable waters" are is a question of local and not federal law. Archer v. Greenville Sand and Gravel Company, 233 U. S. 60, 34 S. Ct. 567, 58 L. Ed. 850 (1914). The common-law rule, set forth in the cited cases, is now generally inapplicable in the United States. The majority rule is that a river is a navigable water if it is navigable in fact. 65 C. J. S., Navigable Waters, Secs. 1-5.

 Code Secs. 686 and 8414 adopt the navigable-in-fact rule, with certain restrictions, but they do not affect the meaning of Const. Sec. 81, which must be determined according to the meaning of this phrase at the time the 1890 Constitution was adopted. The evidence reflects that the ebb and flow of the tide in the Pearl River terminates below the City of Columbia, Mississippi, which is south of Jackson.

 Moreover, appellants offered no evidence to show that the Pearl River is a navigable water-way within the definition of code Secs. 686 and 8414. The burden of establishing that fact was upon the appellants, and they failed to meet it. 65 C. J. S., Navigable Waters, Sec. 9.

## VI.

 Appellants assert that the Act is invalid because Sec. 16 assigns or allocates to the District two mills of the four-mill advalorem levy for state and county property taxes, during the period the bonds are outstanding. Miss. Code 1942, Sec. 9877. It is said that

this violates Miss. Const. Sec. 112, which requires that taxation "shall be uniform and equal throughout the State." Miss. Code Sec. 9877 provides for an ad valorem levy of four mills, but authorizes the Governor under certain circumstances to reduce it to not less than two mills. It is argued that, if this levy were reduced below two mills on a statewide basis, it would be unequal and not uniform as to taxpayers of counties in the District. We do not reach that hypothesis, however, because the statute now in effect precludes deduction below two mills.

■■ ■■ Furthermore, the taxes are imposed equally on property within the District. No requirement of uniformity or equal protection under the Mississippi and Federal Constitutions limits the power of the Legislature in respect to the allocation, distribution and application of public funds. 84 C. J. S., Taxation, Sec. 34. The equal and uniform requirement relates to the levy of taxes, and not to the distribution or application of the revenue of the State. 51 Am. Jur., Taxation, Sec. 165. A somewhat similar ad valorem levy under the BAWI Act was upheld in Albritton v. City of Winona, 181 Miss. 75, 178 So. 799 (1938).

With reference to the special two-mill levy authorized by Sec. 20, in the event other funds are insufficient to pay for the bonds, the five counties by election voluntarily agreed to subject themselves to it. And that levy, if made, must be equal and uniform within the District, according to Sec. 17 of the District Act.

Since the classification for the District is valid, the special, contingent levy authorized by Sec. 20 does not fall within the inhibitions set forth in Walker v. Monroe County, 224 Miss. 801, 81 So. 2d 225 (1955).

## VII.

Appellants contend that the statute violates Sec. 17 of the Miss. Constitution, and also the due process clauses of the State and Federal Constitutions, because it em-

powers the District to acquire private property by condemnation and then to rent, lease or sell it for private use.

Miss. Const. Sec. 17 provides: "Private property shall not be taken or damaged for public use, except on due compensation being first made to the owner or owners thereof, in a manner to be prescribed by law; and whenever an attempt is made to take private property for a use alleged to be public, the question whether the contemplated use be public shall be a judicial question, and, as such, determined without regard to legislative assertion that the use is public."

Sec. 11 (f) gives the District the power to acquire by condemnation property not exceeding one-quarter mile from the outside line of the 300-foot above-sea-level contour on each side of the Pearl River, which is necessary for the project and the exercise of the powers and functions of the District. In other words, if the District finds that is is necessary for its functions to condemn any land within a perimeter of one-quarter mile from the ouside line of the 300-foot contour of the reservoir, the District has the power under this section to take such property by eminent domain upon payment of due compensation.

Appellants do not contend that the District should not have the power of eminent domain to carry out its functions. Obviously the District could not perform its task as an agency of the State without such power. Moreover, the perimeter area of one-quarter mile which the District may condemn must be necessary for the project and for carrying out the powers and functions of the District. Representatives of the District testified that no decision had been made as yet by the Board of Directors of the District as to what part of the perimeter lands are necessary to be taken by purchase or eminent domain.

Provided the taking is for a public use, which is a judicial question under Const. Sec. 17, and provided it is necessary for public purposes, which is essentially a legis-

lative question, but subject to ultimate judicial review, as hereinafter stated, the District clearly is given by statute the right to take by eminent domain the one-quarter permieter area or parts of it.

■■■ The undisputed evidence in this case shows that it is necessary and for a public use for the District to control at least the one-quarter mile perimeter area. There is no evidence to the contrary. That undisputed finding of fact settles the public necessity and the public use in the District's power to utilize eminent domain over the one-quarter mile perimeter, for purposes of this particular suit which is concerned with the constitutionality of the statute.

Appellants' objections are necessarily based upon a circumstance which may or may not occur later under the powers granted the District by the Act. Sec. 11 (f), last paragraph, gives the Board the right to rent, lease or sell land for the purpose of operating recreational facilities thereon for profit, upon public competitive bids, and with an option in the former owner from whom the property was originally taken by eminent domain, to purchase or lease the property by meeting the highest and best public bid. Sec. 11 (v) further gives the District the power to lease, sell or otherwise dispose of any property "for the purpose of furthering the business of the District." Sec. 11 (x) gives a householder actually living on land taken by the District by condemnation the right to repurchase not exceeding forty acres for a price not exceeding the price paid for condemning his land.

It is argued that these statutory provisions, giving the District the power to lease or sell lands previously taken by condemnation, violate. Sec. 17 by empowering the District to first acquire private property by condemnation, and then the lease or sell it for private use. There are three answers to this contention.

First, we cannot assume in advance that the District will abuse its powers. On the contrary, we will presume that the Board of Directors of the District will manage, lease and sell lands acquired by condemnation only for public purposes. Appellants' argument assumes a hypothesis which has not and may not occur. We do not decide cases on non-existent hypothesis.

Second, the undisputed evidence reflects, for the purpose of this case dealing with the creation of the District, that the one-quarter mile perimeter is necessary for the public use in the protection and development of the reservoir. 18 Am. Jur., Eminent Domain, Sec. 41, states the applicable rule: "The general rule is settled that the exercise of eminent domain for a public purpose which is primary and paramount will not be defeated by the fact that incidentally a private use or benefit will result which will not of itself warrant the exercise of the power. This condition arises in every case in which a taking is made by a public service corporation. The incidental benefit to the stockholders in the profits arising from tolls, fares, and other charges does not render the use for which the taking is made a private use, if the tolls, fees, and charges are to be derived from serving the public. Similarly, the fact that incidental private advantages to certain lands are expected to accrue from the construction of the improvement does not derogate from the public nature of the use, if it is constructed for the benefit of the public. Nor does the fact that a byproduct of the taking is sold for private use derogate from the public nature of the use. This rule has been applied in respect of incidental benefit from surplus power or water developed in a taking for public use, from the condemnation of land for parks, from the opening, relocation, or change of grade of a highway, from irrigation projects, from harbor improvements, from the drainage of wet and overflowed lands . . ."

2 Nichols, Eminent Domain (3d. Ed. 1950), Sec. 7.222, discusses this established principle at some length. If

the use for which the land is taken by eminent domain is public, "the taking is not invalid merely because an incidental benefit will inure to private individuals." Here it is undisputed that the purpose of acquisition of perimeter lands will be for a public use and public necessity. The conditional or discretionary power in a district to later lease or sell the property is only a minor incident to the general public purpose of the Act.

Third, any later leases or sales by the District of land which it has previously acquired by eminent domain must contain such restrictions and provisions therein as will be reasonably necessary to carry out the public purposes and functions of the District.

That conclusion is deducible from the statute itself. Sec. 11 (f), last paragraph, requires that in leases or sales for recreational facilities for profit "the Board shall, by resolution, specify the terms and conditions of such sale, rental or lease . . ." The same paragraph refers to the "terms and conditions" of such conveyances, and "complying with all terms and conditions of such renting, leasing or sale, as specified by the Board." Sec. 11 (v) requires that leases and sales of all types must be "subject to the provisions of this Act", and "for the purpose of furthering the business of the District." The purpose and business of the District are clearly set forth in the Act. By clear inference they require that any later leases or sales, of any property previously acquired by the District by eminent domain, must contain such restrictions and provisions as will meet the requirements of the statute, and as will in the future protect and carry out the public purposes of the District.

Similar in fact and application is Albritton v. City of Winona, 181 Miss. 75, 107, 178 So. 799 (1938). The Court there upheld the validity of a statute authorizing municipalities to purchase or condemn property for the erection of manufacturing enterprises, and to sell or lease the same to private companies for the continued

operation of the industry. The Act did not expressly prescribe any restrictions in such leases and sales. The Court in that respect made this observation: ''The statute does not specifically prescribe the terms of this lease, but follows the usual course of leaving that to the public officers charged with the duty of carrying out the purposes of the statute, e. g., Section 2455, Code 1930. We are not called on, and are without authority, to here specifically set forth and limit the provisions of such leases, and we must presume that the municipal officers and the Mississippi Industrial Commission will take care that the provisions of the leases will meet the requirements of the statute. If they do not, the leases will be void. It may not be amiss, however, to say that one effectual method for preventing the lessee from holding the property without carrying out the purposes for which it was acquired would be to insert in the lease a clause setting forth the character and capacity of the proposed industry, and providing for the termination of the lease if the lessee fails within a specified time to equip and operate the industry as described in the lease or discontinues for a specified time thereafter to so operate it.''

Somewhat similar to the instant problem are the slum clearance statutes and cases. Usually a public corporation is given the power to take by eminent domain slum-infested areas, to clean that area, and to lease or sell it for continued uses consistent with the public purposes of the original taking. The validity of that procedure has been uniformly upheld. Berman v. Parker, 348 U. S. 26, 75 S. Ct. 98, 99 L. Ed. 27 (1954); Anno. 130 A. L. R. 1069, 1076 (1941); 18 Am. Jur., Eminent Domain, Secs. 52, 38.

City of Tulsa v. Williams, 100 Okla. 116, 227 P. 876 (1924), is directly in point on the validity of a power in a public corporation to condemn by eminent domain property not only for the bed of a reservoir, but also for

a perimeter area around it, which is needed to protect the reservoir from pollution and for the purpose of controlling it. That case upheld the City of Tulsa's right to condemn a perimeter area, on the basis of testimony of engineers and other expert witnesses, that the watershed above the highwater line, a margin around the reservoir, was necessary to be taken for public use. In the instant case all of the evidence reflected that the one-quarter mile perimeter was necessary for public use of the reservoir.

Sec. 11 (f), second par. states: "The amount and character of interest in land, other property and easements thus to be acquired shall be determined by the Board of Directors and their determination shall be conclusive and shall not be subject to attack in the absence of manifold abuse of discretion or fraud on the part of such Board in making such determination."

Under Const. Sec. 17 the question of whether the land taken is for a public use is a judicial question. We adjudicate here that the one-quarter mile perimeter area, if taken by eminent domain, will be for a public use. The undisputed evidence so shows.

The above-quoted sentence from Sec. 11 (f) has reference to public necessity, as distinguished from public use. Whether there is a public necessity for a taking is essentially a legislative question. In Ham v. Levee Commissioners, 83 Miss. 534, 551, 555, 35 So. 943 (1903), the governing board of the levee district passed an order directing the construction of a new levee, the abandonment of an old one, and the issuance of bonds to finance the new construction. Upholding this action, the Court said: "The building of the new levee being within the power of the board of levee commissioners, and the taking of the private property being judicially determined to be for a public use, the courts will not place judicial restraint upon the manner in which the board, in the exercise of its discretion, uses the power providen-

tially delegated to it by the state. It is for the courts to determine that the proposed taking is for a public use, but, this being so decided, it is for the commissioners to decide upon the necessity of such taking. . . . Courts will interfere and review the exercise of the discretion of those to whom the power of eminent domain has been delegated by the legislative enactment only in exceptional cases—as when property is appropriated for private purposes under the guise of public use, or if the condemnation is sought for private gain, or from willful or malicious purposes or to injure or destroy the rights of other parties, or that they acted without warrant of law and oppressively.''

The Ham case was followed in City of Greenwood v. Gwin, 153 Miss. 517, 535-536, 121 So. 160 (1929). The City sought to condemn a joint right with Gwin to maintain a waterworks and sewerage system under the streets of the City. The decision upheld the City's power to take less than appellee's entire right. The Court said: ''Section 17 of the Constitution makes it a judicial question as to whether the contemplated use for which property is sought to be condemned to be a public one; but it does not authorize the court to determine the public necessity for the taking. Appellant's mayor and commissioners alone could decide that question. Their decision, unless brought about by fraud or abuse of discretion, is conclusive. Ham v. Board of Levee Commissioners, 83 Miss. 534, 35 So. 943. There is nothing in the record in this case showing or tending to show that their determination of the question of public necessity was the result of either fraud or an abuse of discretion. Property already devoted to public use may be again taken or damaged for public use.''

██ ██ As already stated, we herein judicially decide that all property taken by the District, including any taken within the quarter-mile perimeter, will be for a public use. Whether the taking of a particular piece

or parcel of property is necessary for the public use is, as held in *Ham* and *Gwin,* essentially a legislative question, to be determined by the District; but the courts may interfere if the District's determination of the question of public necessity is the result of fraud or abuse of discretion.

 This important and farsighted project by the State and the counties in .the District appears in its magnitude and public purposes to be a significant example of the essential vigor of state and local governments. It evidences a farsighted and progressive public spirit, and is a refreshing demonstration of initiative by the State, as contrasted with the current trend toward reliance on the Federal Government for projects of this magnitude. We hold that the Act is constitutionally valid and the District is properly created.

Affirmed.

*Hall, Lee, Holmes, Arrington* and *Gillespie, JJ.,* concur.

KYLE, J., Dissenting in part:

I think the legislature had the power to authorize the creation of a water supply district for the purposes set forth in Section 2 of Senate Bill No. 1724, Laws of 1958, known as the Pearl River Water Supply District Act. The legislature also was authorized to confer upon such district the power of eminent .domain, for the purpose of acquiring lands for the construction of the reservoir and any other necessary or useful related facilities. But, I am unable to agree with the majority holding in this case that all of the land lying within the one-quarter mile perimeter area referred to in Sec. 11, paragraph (f) of the Act may be taken by eminent domain proceedings under the claim that there is a public necessity for the taking or that the lands are to be taken for a public use. Whether any particular tract of land which the District

may hereafter seek to acquire by eminent domain proceeding is to be taken for a use which is public is a question which, in my opinion, must be determined by the Court at the time of the taking after a proper hearing, either in the eminent domain proceeding or in some other proper proceeding.

Section 17 of the Miss. Constitution of 1890 expressly provides that ''whenever an attempt is made to take private property for a use alleged to be public, the question whether the contemplated use be public shall be a judicial question, and, as such, determined without regard to legislative assertion that the use is public.''

Section 11 of Senate Bill 1724, Laws of 1958, provides that the Pearl River Valley Water Supply District, through its board of directors, is empowered to ''acquire by condemnation any and all property of any kind, real, personal or mixed, or any interest therein, within the project area not exceeding one quarter mile from the outside line of the 300 foot above sea level contour on each side of Pearl River except as provided for rights of way under Subsection (g) of this section, within or without the boundaries of the District necessary for the project and the exercise of the powers, rights, privileges and functions conferred upon the District by this Act, according to the procedure provided by law for the condemnation of lands or other property taken for rights of way or other purposes by railroads, telephone or telegraph companies.''

Section 2751, Code of 1942, provides: ''When any person or corporation having the right so to do shall desire to exercise the right of eminent domain, he or it shall make application therefor in writing, and the owners of the property sought to be condemned and mortgagees, trustees, or other persons having an interest therein or a lien thereon, shall be made defendants thereto, which shall state with certainty the right and describe

the property sought to be condemned, showing that of each defendant separately.''

Section 2756, Code of 1942, provides that: ''Where the application seeks to condemn the property of more than one defendant interested in different property, a separate trial shall be had for each; and the court may set the trial of any one or more of the issues for a time and place to be fixed by order of the court, and the parties and jury shall be compelled to attend accordingly.''

It is only after the evidence has been presented in the eminent domain suit that the court can determine whether the particular tract of land owned by the defendant in that suit is being taken for a public use. The learned chancellor who tried this case recognized that fact, and in his opinion stated that the question of whether the use for which particular lands would be taken would be a public use was a judicial question to be determined in a court of eminent domain, and that question was not an issue in this proceeding. It is admitted that the legislature could not settle that question by legislative fiat for the reason that Section 17 of the State Constitution makes it a judicial question, to be determined by the court after the court has acquired jurisdiction of the parties and after a hearing of the condemnation suit upon its merits. This Court, in my opinion, has no authority in this proceeding to prejudge the rights of the individual land owner whose land at some later date may be made the object of a condemnation proceeding by holding in advance that ''the one quarter mile perimeter area, if taken by eminent domain, will be for a public use.'' That is the question which should be determined at the time of the hearing of the application for the taking. The Court can then determine whether the land is to be acquired for public use or whether it is being acquired for the purpose of resale to other persons or corporations for private use or the operation of recreational facilities thereon for profit.

In the case of Tulsa v. Williams, et al, (Okla. 1924), 227 P. 876, which is cited in the majority opinion, the court held that: "Where a municipal corporation seeks to create a waterworks plant and water reservoir outside of its corporate limits, it has a right, under the law of eminent domain, to condemn such land as shall be submerged by its reservoir up to the high water line; and also has the right to condemn such margin of land above the high water line of its reservoir as may be needed, where the perpetual use and absolute control thereof is required, to protect its water supply from pollution and for policing and patrolling the shore of its reservoir; but how much margin above the high water line should be taken for such purpose is a judicial question to be determined by the court upon evidence of the necessity." The court in its opinion in that case also said: "It is conceivable that in many places only a short distance from the highwater line would be sufficient, while in many other places a much greater distance from the high water line would be required. The necessity is a question of fact as to the necessary line of absolute control above the high water line on each piece of land sought to be condemned, and is a matter for judicial determination based upon evidence."

In City of Chicago v. Lehmann, 262 Ill. 468, 104 N. E. 829, the Court said: "The question whether the sovereign power of eminent domain shall be conferred upon corporations or municipalities to appropriate private property for public use is legislative and not subject to interference by the courts (Chicago, Rock Island & Pacific Railroad Co. v. Town of Lake, 71 Ill. 333), but the question of whether the particular property sought to be appropriated is necessary for the public use is for the courts. If the necessity does not exist, the land cannot be taken, and the property cannot be taken, and the property owner would be without the protection to which he is entitled if the determination of a corporation, private

or municipal, to take his property conclusively settled the necessity of the taking.''

Inasmuch as property cannot constitutionally be taken by eminent domain except for the public use, it follows that no more property shall be taken than the public use requires. The fallacy in the majority holding in this case, as I see it, is that the holding in effect deprives the individual landowner of his property without a hearing, as required by Sec. 17 of the State Constitution, on the question whether the property is being taken for a public use.

*Roberds,* P. J., joins in this opinion.

McGEHEE, C. J., Dissenting:

The controlling opinion herein states in the first paragraph thereof that the principal point made by the appellants is that the Act in question ''violates Section 17, Miss. Constitution of 1890, because, they assert, it empowers the District to acquire private property by condemnation, not for a public use, and then to rent, lease, or sell it for private use.'' And it is then further stated ''We do not agree with that interpretation of the statute or the other assignments of error''. With deference, I agree with the first foregoing quoted statement, and I therefore respectfully dissent from the decision being rendered herein. The Act affirmatively discloses on its face in Section 11 thereof that it empowers the District to do what the appellants contend.

Subsection (f) of Section 11 of Senate Bill 1724 (Advance Sheet 13) Laws of 1958, provides that the Pearl River Valley Water Supply District may ''acquire by condemnation any and all property of any kind, real, personal, or mixed, or any interest therein within the project (reservior) area not exceeding one-quarter mile from the outside line of the 300 foot above sea level contour on each side of Pearl River, * * *.''

And the second paragraph of Subsection (f) (3) of Section 11 reads as follows: "Provided further that where any site or plot of land is to be rented, leased or sold to any person, firm or corporation *for the purpose of operating recreational facilities thereon for profit,* then the Board shall, by resolution, specify the terms and conditions of such sale, rental or lease, and shall advertise for public bids thereon. When such bids are received, the same shall be publicly opened by the Board, and the Board shall thereupon determine the highest and best bid submitted, and shall immediately notify the former owner of such site or plot of the amount, terms and conditions of such highest and best bids. Such former owner of such site or plot shall have the exclusive right at his option, for a period of thirty (30) days after the determination of the highest and best bid by the Board, to rent, lease or purchase said site or plot of land, by meeting such highest and best bid, *and by complying with all terms and conditions of such renting, leasing, or sale, as specified by the Board; provided, however, the Board shall not in any event, rent, lease or sell to any former owner more land than was taken from such former owner for the construction of the project, or one-quarter mile of shore-line, whichever shall be the lesser.* If such option is not exercised by such former owner within said period of thirty (30) days, then the Board shall accept the highest and best bid submitted." (Italics mine). It will be noted that the italicized portion of this provision of the Act, following the semi-colon, prevents the Board from renting, leasing, or selling to any former owner more land than was taken from such former owner for the construction of the project, or one-quarter mile of shore-line, whichever shall be the lesser. The first clause above italicized, following the semi-colon, refers to the area of land that may be sold to a former owner, whereas the last clause thereof refers to the distance from the shore-line beyond which a former owner may reacquire

any of the land taken from him, "whichever shall be the lesser". As to what these last quoted five words mean no one has ventured to express a thought. My own best notion as to what the Act means to say is that the District intends to preclude a former owner of any of the perimeter land from acquiring any portion thereof within a quarter of a mile of the shore-line of the reservoir, under any circumstances, and that the District intends that only those persons whom they choose shall be permitted to rent, lease, or purchase any portion of the perimeter lands within a quarter of a mile of the shore-line, and that they can acquire it only "for the purpose of operating recreational facilities thereon for profit". The Act provides for this authority on the part of the District by its terms.

It is true that elsewhere in the Act, Subsection (x) of Section 11, provides that "Any bona fide, resident householder, actually living or maintaining a residence on land taken by the District by condemnation shall have the right to repurchase not exceeding forty (40) acres of his former land or other available land from the Board of Directors for a price not exceeding the price paid for condemning his land." This, of course, has reference to land located beyond one-quarter of a mile from the shore-line.

It is apparently recognized by the controlling opinion herein, in the first paragraph thereof, that if the Act "empowers the District to acquire private property by condemnation, not for a public use, and then to rent, lease or sell it for private use," this would be in violation of Section 17 of the Mississippi Constitution of 1890.

Subsection (w) of Section 11 of the Act provides that: "When in the opinion of the Board of Directors as shown by resolution duly passed, it shall not be necessary to the carrying on of the business of the District that the District own any lands acquired, then the Board shall advertise such lands for sale to the highest and best bid-

der for cash, * * * ." It is obvious that under this provision of the Act the Board of Directors may determine that any portion, or even the greater part, of the perimeter lands within one-quarter of a mile from shore-line is not necessary to the carrying on of the business of the District, and then proceed to advertise and sell the same for private use, unless as provided for under the second paragraph of subsection (f) (3) a former owner desires to rent, lease or purchase the same for the purpose of operating recreational facilities thereon for profit, "by complying with all terms and conditions prescribed by the Board". There is nothing in the Act to prevent those "terms and conditions" being such that a former owner cannot afford to match the highest and best bid for the land.

Section 17 of the Constitution of 1890 provides in full as follows: "Private property shall not be taken or damaged for public use, except on due compensation being first made to the owner or owners thereof, in a manner to be prescribed by law; and whenever an attempt is made to take private property for a use alleged to be public, the question whether the contemplated use be public shall be a judicial question, and, as such, determined without regard to legislative assertion that the use is public."

The chancellor recognized in his opinion dictated into the record that the "objections (of the appellants) that have been made at this hearing are not as to the creation of the Pearl River Water Supply District itself. The objections go to the question, of course, of the value of the lands, and also the question of the taking of particular lands, whether the use for which such lands would be taken would be a public use, and as the Court sees it, that would be a judicial question to be determined in a court of eminent domain, and is not in issue in this proceeding."

Nevertheless the controlling opinion herein states in its 58th paragraph the following: "Under Const. Sec. 17 the question of whether the land taken is for a public use is a judicial question. *We adjudicate here that the one-quarter mile perimeter area, if taken by eminent domain, will be for a public use. The undisputed evidence so shows.*" (Italics mine). This Court is, in my opinion, without authority to make the foregoing adjudication in this proceeding for the following reasons: First, the chancellor found among other things that the question of the taking of particular lands, whether the use for which such lands would be taken would be a public use, would be a judicial question to be determined in a court of eminent domain, and is not in issue in this proceeding. And second, the owners of the perimeter lands were not made parties to this proceeding. The Counties of Hinds, Madison, Leake, Rankin and Scott, the City of Jackson and the Board of Water Commissioners of the State of Mississippi were the sole defendants. In fact the fourth paragraph of Subsection (d) of Section 5 of the Act in question undertakes to provide that "it shall not be necessary that any land owners in the counties to be included in said proposed district be named in the petition, or made parties defendant." Therefore, I think the chancellor correctly observed that the question of whether the use for which such lands would be taken would be a public use, would be a judicial question to be determined in a court of eminent domain, and is not in issue in this proceeding.

Then, too, at the very threshhold of any suit in eminent domain the landowner is entitled to litigate the issue as to whether the use for which his lands are to be taken would be a public use. But we are asked in effect on this appeal to render a declaratory judgment, which we have no jurisdiction to do, or an advisory opinion as to whether the lands within one-quarter of a mile of the shore-line of the reservoir are being taken for a public

use, and without regard to what the several landowners may be able to show in defense of a suit in eminent domain. In other words, in the eminent domain case, referred to by the chancellor in his opinion, the landowner will be confronted with an adjudication by this Court that one of the main issues in the eminent domain proceeding may have been already foreclosed. Since the perimeter lands are located in the five counties, and since only two of the landowners intervened in the trial court in this case, and since their objections were held by the chancellor to be properly determined (in the future) in a court of eminent domain, and were not in issue in this proceeding, and since all of the adjacent landowners are to be affected by the majority opinion, assuming, but not conceding, that we have any jurisdiction of them without process to decide as to whether the land within one-quarter of a mile of the shore-line of the reservoir have been adjudicated on this appeal, if taken by eminent domain, to be for a public use, then the said Senate Bill 1724, Laws of 1958, as applied to such landowners is clearly unconstitutional as being the taking of private property without due process of law contrary to the Fourteenth Amendment to the Constitution of the United States and Sections 14 and 17 of the Mississippi Constitution.

Moreover Subsection (h) of Section 11 of the Act purports to grant authority to the District "to overflow and inundate any public lands and public property, including sixteenth section lands, and in lieu lands within the project area." Section 31 of the Act does provide that "the District shall pay a reasonable rental for the use of such lands to be overflowed, to be determined as provided by law in such cases." It is conceded that three sixteenth sections of land are to be overflowed in whole or in part, but by a depth of not more than 300 feet of water, and since a reasonable rental value for the use of such lands would be determined as provided by law in such cases, it can reasonably be expected that

since the rental value of such land is determined by what would be a fair rent from year to year during the forty year life of the District, there is nothing in the Act that would protect the interest of the educable children of the townships if the successors in office to the present Board of Directors should determine that the reasonable rental would only be a nominal sum with the land inundated. In other words, the two provisions of the Act hereinabove last quoted grant the authority for these sixteenth sections to be virtually destroyed, notwithstanding the fanciful declaration of Section 13 that the overflowing and inundation of these sixteenth sections shall not constitute legal waste.

The chancellor found on an abundance of testimony that the construction of the intended project was feasible from an engineering standpoint. With a bond issue of $24,200,000 for use for the purpose, I am not prepared to say that most any project would be feasible from an engineering standpoint.

The Act also provides that in addition to the counties of Hinds, Madison, Leake, Rankin and Scott and all other counties through which Pearl River runs or constitutes a boundary of may come into the District, which could include Copiah, Simpson, Lawrence, Marion, Pearl River and Hancock Counties. And Section 16 of the Act provides that ''so long as any bonds issued hereunder are outstanding, the tax collector of each county shall pay into the depository selected by said Water District for said purpose the amount of two mills of all the ad valorem taxes due by the county to the State of Mississippi which is collected by the sheriff and tax collector of the county.'' In other words, contrary to the public policy of this state, if not in violation of Section 112 of our State Constitution, the Act provides for the exemption of eleven counties from a state two mill ad valorem tax levy. By the same token the Yazoo-Mississippi Delta Levee District and the Mississippi Levee District would be entitled to an exemption from two mills of the state

ad valorem tax levy. By a policy of carving out of the domain of the state one group of counties after another, the eventual result would be to deprive the state of the revenue for the operation of the expenses of the state government so far as two mills of the state ad valorem tax levy is concerned.

Section 24 of the Act undertakes to usurp the functions of the governing bodies of counties, cities, towns, school districts, banks, savings banks, trust companies, building and loan associations, savings and loan associations and insurance companies in regard to the safe keeping of public funds, by declaring that the bonds of the District are authorized investments of such funds, including the funds of the Mississippi Public Employees Retirement System, and without regard to the judgment and discretion of the local governing bodies or particular agencies charged with the responsibility of guarding the safety of such funds.

As stated in the controlling opinion herein the Act contains approximately 19 printed pages and 33 sections, but I shall not prolong this opinion by undertaking to elaborate on all of the objections to the validity of this Act that occur to me, but in conclusion I shall point out that the chapter on Eminent Domain in the Code of 1942 is not sought to be amended by any of the provisions of the Act in question. Section 2760, Code of 1942, in the chapter on Eminent Domain, prescribes the form of an instruction which shall be given to the jury in every eminent domain case, and among other things that instruction tells the jury that ''you are not to deduct therefrom (the damages to the landowner) anything on account of the supposed benefits incident to the public use for which the application is made.'' In other words, it is contemplated that the landowner is entitled to receive, free of cost to him, any increased value to his property that may result from the contemplated improvement, but the landowner is so hamstrung by the provisions of the Act in question that he, rather than someone else, will

not be able to receive, except to a very limited degree, the increased benefits that may come to his land by reason of the construction of this project.

Further the Act is, in my opinion, unconstitutional wherein it authorizes this District to require the necessary relocation of roads and highways, etc; whereas the State Constitution vests the full jurisdiction over the roads and highways in the boards of supervisors and the State Highway Commission. How this jurisdiction can be taken away from these bodies without a constitutional amendment I am unable to comprehend.

The Act in question is so far-reaching that it even presumes to declare in Section 32 thereof that: "Nothing in this Act shall be construed to violate any provision of the federal or state constitutions * * *." Since the majority opinion is controlling in this cause I assume that I have not violated this injunction.

Of course every good citizen is in favor of any valid legislation designed to promote the industrial, agricultural, recreational, public health and general welfare of the state, but I am unable to vote to uphold the constitutionality of the Act in question for the reasons hereinbefore stated and for other reasons not necessary to enumerate in a review of this very lengthy and far-reaching statute.