557 So.2d 486 (1990)
James DYCUS, Jimmy Dycus, Roger Dycus, a Minor, Tommy Dycus, Charley Allen, and Allen Ford, and all Persons Unknown to the Appellants Having or Claiming any Legal or Equitable Interest in the Subject Land
v.
Lena R. SILLERS, Mary S. Skinner, Evelyn S. Pearson, Lilian S. Holleman, John L. Pearson, Evelyn P. Weems, Vernon W. Holleman, Jr., Florence H. Schoenfeld, Alice K. Jones, and Merigold Hunting Club, Inc., a Mississippi Corporation.
No. 07-CA-58271.
Supreme Court of Mississippi.
January 10, 1990.
*487 Willard L. McIlwain, Greenville, for appellants.
Gerald H. Jacks, Jacks Adams & Westerfield, Andrew M.W. Westerfield, Jacks Adams & Westerfield, Cleveland, Robert S. Crump, III, Jacobs Eddins Povall Meador & Crump, Rosedale, for appellants.
Mike C. Moore, Atty. Gen., Helen Wetherbee, Timothy L. Waycaster, Jayne L. Buttross, Sp. Asst. Attys. Gen., Jackson, for amicus curiae.
Before ROY NOBLE LEE, C.J., and ROBERTSON and BLASS, JJ.
ROBERTSON, Justice, for the Court:

I.
This is a case about a fishin' hole. It lies in western Bolivar County near the River, and at birth was named Beulah Crevasse, though many have long called it the Merigold Blue Hole. People who can get there without trespassing on land want to enter and fish. Landowners and their long time lessee hunting club want just as badly to keep the public out. The relative scarcity of good fishing spots, Landowners' bona fide needs for protection of their valuable timber and water resources, club members' desire for undisturbed aesthetic and sporting enjoyment of the blue hole they have long thought theirs, the violent life of Old Man River, notions of fish as ferrae naturae, and, as well, the human penchant for confusing want with right, desire with entitlement, and the familiar with the necessary  these and more form important background forces driving this civil warfare which we are charged to channel within the levees of the law.

II.
This is also a case about a people, the waters they fish, and a unique culture and lore. These form an ambiguous but real part of our life whose pulse is preserved in the product of our poets from the famous to the obscure.[1]
Many think fishing the most leisurely of leisure activities, the positive pursuit of the lazy. In describing his childhood in Yazoo County, Willie Morris recalls
We did cane-pole fishing, both to save money and because it was lazier, for we seldom exerted ourselves on these trips to Wolf Lake or Five Mile.[2]
It was a leisure to be consumed and cherished, a spot in the shade preferred, and whether the fish were biting was secondary.
When the biting was good, we might bring home twenty or thirty white perch or bream or goggle-eye; when it was bad we would simply go to sleep in the boat.[3]
But there was always a Miss Julia Mortimer, the local school marm, revered in time but then the scourge of every young Willie Morris, Miss Julia who'd "get behind some barefooted boy and push," said Uncle Percy. "She put an end to good fishing,"[4]
Outside the home, we boys was more used to sitting on the bridge fishing than lining the recitation bench. Now she wanted that changed,[5]
Uncle Curtis remembered of Miss Julia.
Fishing is a part of the very life and being of many in Mississippi, as with Eudora Welty's enigmatic Billy Floyd, of whom "it was said by the old ladies that he slept all morning for he fished all night,"[6] and who Jenny noticed when he walked down the street because "his wrist hung with a *488 great long catfish."[7] Ellen Douglas' Estella, who had just given birth said "Baby or no baby, I got to go fishing after such a fine rain,"[8] the same Estella in whose fishing style Douglas sees poetry, Estella who
addressed herself to the business of fishing with such delight and concentration... . She stood over the pool like a priestess at her altar, all expectation and willingness, holding the pole lightly as if her fingers could read the intentions of the fish vibrating through line and pole.[9]
Then there is Walker Percy's Anna Castagna, Binx Bolling's mother, who "looks like the women you see fishing from highway bridges,"[10] who sits on the porch overlooking the water at Bayou des Allemands and
casts in a big looping straight-arm swing, a clumsy yet practiced movement that ends with her wrist bent in in a womanish angle. The reel sings and the lead sails far and wide with its gyrating shrimp and lands with hardly a splash in the light etherish water. Mother holds still for a second, listening intently as if she meant to learn what the fishes thought of it, and reels in slowly, twitching the rod from time to time.[11]
Many Mississippians, including our own Chief Justice Roy Noble Lee,
feel that a person who has never ... angled for bass or caught bream on a light line and rod, or taken catfish from a trotline and limb hook, has never lived.[12]
Still, some of us are like Faulkner's Lucius Priest who at age 11, when Uncle Parsham asked, "Do you like to go fishing?," thought "I didn't really like it. I couldn't seem to learn to want  or maybe want to learn  to be still that long," but said quickly: "Yes, sir."[13] Lucius, being led to Mary's fishing hole,
sat on the log, in a gentle whine of mosquitoes.... Then I even thought about putting one of Lycurgus's crickets on the hook, but the crickets were not always easy to catch... . [When nighttime finally fell and Uncle Parsham returned,] "had a bite yet?" [Lucius finally confessed,] "I ain't much of a fisherman," I said, "how do your hounds hunt?"[14]
Binx Bolling was of Lucius' mind, though it is doubtful they had anything else in common. "You know I don't like to fish," Binx said to this mother.
"That's true," she says after a while, "You never did. You're just like your father... . . He didn't like to fish?"[15]
And so of Preston Cunningham,[16] even though his unwitting son, Carroll, had had a pond dug for him beyond the yard "stocked with bass and perch."
But even for those who warm to it so much more than Lucius and Preston and Binx, and maybe even Binx' father, fishing is not the central motion of our outdoor life but is always second fiddle to the hunt. Not quite the afterthought, it is the interlude, the escape, relaxation, almost taken for granted until you can't fish, not nearly so enobling or paradoxical as hunting the deer, with its ritual rite of passage of adolescence and loss of innocence as when the old half-Indian Sam Fathers "dipped his hands into the hot blood" and marked young Ike McCaslin's face teaching him humility and pride.[17]
Perhaps it is because the fish is less like us  and more plentiful and more familiar, *489 it is not the centerpiece but the analogy, the simile, as Ike thought as the bear disappeared into the woods:
It faded, sank bank into the wilderness without motion as he had watched a fish, a huge ole bass, sink back into the dark depths of its pool and vanish without even any movement of its fins.[18]
Or Eudora Welty's "[m]uscadine spread under the waters rippling their leaves like schools of fishes."[19] Will Barrett's "knee leapt like a fish."[20] Gary, Larry Brown's lonesome night hawk, found Connie "cold as a fish."[21] And from Beverly Lowry:
Might have been pleasant. Looking at his white behind-the-ear skin. White as a cooked perch, Emma Blue wistfully thought after she had refused John Robert's offer of a ride to school.[22]
Fish furnish less pleasant images. Again, Welty, describing the house after the floodwaters had receded:
"That slime, that's just as slick! You know how a fish is, I expect," the postmaster was saying affably to both of them, ... "That's the way a house is, been under water."[23]
Mississippi's game fish are of many stripes, their personalities as different as our people. There are the bream, Nash Buckingham's "matchless little marauders"[24], but the biggest, little bigger than the size of your hand,[25] to any objective observer "the sweetest eatin' there is."[26] There are the perch and crappie, but little poetry about these.
Then there is the large mouth bass, Buckingham's "leviathans,"[27] "placed in the waters of the South so that fishermen have a preordained reason for idleness and spending money."[28] Outdoorsman Jim McCafferty says of bass: "This savage fighter will attack the right crank bait with all the fury of a treed wildcat."[29] Fishing for white bass on the oxbow lakes in the Delta, McCafferty exaggerates only slightly when he talks of "his duels with bruising white bass tak[ing] on an image of a sheriff looking for the outlaws."[30] David Chapman Berry, who grew up in the Delta, encounters the bass and is moved to poetry:
Stump in the pond, stump in my eye. My fly pops inches from the stump. Bass, all wrist, roiling deep in thought, wedge from the bottom of the headpan, and buckling the surface under the fly, blur through their tunnel of scales, shattering the mirrory surface, the fly engorged, the fly, the fly leading the bass by the lip.
I break their heads with the butt of the Buck knife. They stiffen shimmering. Scaling rakes the silver off mirrors  my raw eye a dump of shimmers? I eat fish to keep my head stocked. Some fellows refinish mirrors, but I eat fish to restore ponds. Don't believe it that life's only a matter of how you look at it. Smell my hands.[31]
*490 Finally, is the ubiquitous catfish, of the family ictaluridae, the blue, the channel and the flathead, of whom legends transcend the fact-fiction dichotomy. A gargantuan catfish bumped into Marquette's canoe, almost prompting the French explorer to believe what the Indians had told him about the river's roaring demon.[32] Huckleberry Finn and Jim caught a catfish that was as big as a man and "weighed over two hundred pounds."[33] Hodding Carter claimed to have "gigged a catfish that measured almost five feet in length."[34] Though still regarded rough fish, channel catfish farming has become the nation's leading aquaculture industry with Mississippi producing an estimated 200,000,000 pounds of farm-raised catfish a year.
The fisherman's tackle and gear vary widely, from the cane pole used to fish for bream and catfish. The legendary Kentucky reel is still the favorite of the bass fisherman.[35] Brooks Haxton tells of jug fishing. "[Y]ou took gallon jugs. Empty Clorox bottles were the best."[36] Hodding Carter jugfished for catfish.
In jug fishing  to explain to the uninitiated  empty, gaudily-painted gallon jugs float downstream, each dangling a heavy cord and hook and smelly bait from its corked mouth. The fisherman's boat follows lazily. When the catfish strikes, under go jug and fish and both remain there until the fish's strength is gone. There both erupt into the air and the fisherman approaches to pull in his catch. Incidentally, you don't scale a catfish. You nail him against a tree or barn and  since he has no scales, but a heavy, tough skin  you skin him.[37]
The Encyclopedia of Southern Culture suggests a
corrolation between the economic and social stature of fishermen, the game fish they pursue, and the method they prefer to use. At the bottom of the economic scale, the preferred fishing is catfish/bream by cork or bobber fishing/bait casting, bass/spinner fishing is the choice of blue collar families, bass fly-rod fishing of white collar workers, and artificial fly fishing for native trout is the preserve of upper income professionals.[38]
The point is belied by Ellen Douglas' ten-year-old Ralph Glover, hardly a child of poverty or disadvantage.
"I brought my gig," Ralph said, as they all trudged across the levee toward the Yacht Club. "I'm going to gig one of those great big buffalo or a gar or something."[39]
Still few would deny Larry Brown's truth:
The rich have never seined minnows to impale upon hooks for pond bass. The rich do not camp out. The rich have never been inside a mobile home.[40]
Not every Mississippi fisherman experiences what Mabry Anderson calls "the hypnotic lure of the outdoors."[41] Consider the Yocono River, Faulkner's Yoknapatawpha River, starkly seen by James Seay in his "Grabbling in Yokna Bottom."[42]
The hungry come in a dry time To muddy the water of this swamp river And take in nets what fish or eel Break surface to suck at this world's air. But colder blood backs into the water's wood  Gills the silt rather than rise to light  And who would eat a cleaner meat Must grabble in the hollows of underwater stumps and roots, Must cram his arm and hand beneath the scum And go by touch where eye cannot reach, Must seize and bring to light *491 What scale or slime is touched  Must in that instant  on touch  Without question or reckoning Grab up what wraps itself cold-blooded Around flesh or flails the water to froth, Or else feel the fish slip by, Or learn that the loggerhead's jaw is thunder-deaf, Or that the cottonmouth's fangs burn like heated needles Even under water.
The well-fed do not wade this low river.
Mississippi is "the only state with a season for ... [grabblin']."[43] Others compelled to fish are left by law and society no choice but to fish in such undesirable places as the ramp at Ellen Douglas' Lake Okatukla leading to the Phillipi Yacht Club.
Even in this terrible heat, at noon on the hottest day of the year, breathing this foul, fishy air, there will always be a few people fishing off the terminal barges, bringing in a slimy catfish or a half-dead bream from the oily water, raising their long cane poles and casting out their bait over and over again with dreamlike deliberation, ...[44]
Of course, mention of Huck Finn's and Hodding Carter's catfish tales suggests another inexorable feature of fishing, what Nash Buckingham called "finwhoppers."
The worst of us get fed up and bored with pure, unadulterated lying. But a certain amount of rod and reel spoofing is absolutely essential to salve conscience, offset temptation and lend color.[45]
Barry Hannah tells us of water liars of another dimension in his story about "Farte Cove off the Yazoo River ... where the old liars are still snapping and wheezing at one another."
"MacIntire, a Presbyterian preacher, I seen him come out here with his son-and-law, anchor near the bridge, and pull up fifty or more white perch big as small pumpkins. You know what they was using for bait?"
"What?" asked another geezer.
"Nuthin. Caught on the bare hook. It was Gawd made them fish bite," said Sidney Farte, going at it good.
"Naw. There be a season they bite a bare hook. Gawd didn't have to've done that," said another old guy, with a fringe of red hair and a racy Florida shirt.[46]
Like tales are told at the Coffee Shop off the square in Clanton, Mississippi, where the folks talk "local politics, football and bass fishing."[47]
Fishermen see a different world than the rest of us. According to Mabry Anderson, "Unless you are over forty years old and a bream fisherman, you probably think a cockroach is just a dirty black bug."[48] They humanize these unhuman-like piscators, often talking the fish into the boat.[49] Lawyer Frank Wynne, a witness at trial, describing the contours of the Merigold Blue Hole, how the waters back out when the River is falling, lapses and tells of "a good fishing place" back where the waters come out of the woods and over the road. "I'll tell you what, you can go in there and catch a nice bass," and through the cold record his smile and priorities are seen.
The waters as well compete for bragging rights. The night before on what Doc had called "the best river dragging he'd ever been on," William Wallace had said "There is nothing in the world as good as ... fish. The fish of the Pearl River."[50] But none is the source of more lore and awe than the Mississippi. David Cohn said in the Delta, folks "fear God and the Mississippi River."[51] Mabry Anderson said, "The Old *492 Man just rolls on and on and wipes out most of man's mistakes each spring when it charges right out of its banks."[52]
No man alive can bob about on its surface in a puny fourteen-foot boat when the gauge is showing fifty feet or more at Helena, Arkansas, without becoming a little more tolerant and just a little less sure of himself.[53]
Still some see a flood a blessing, some like Luke Wallin's Watersmith and his sons Jesse and Bean and Robert Elmer who fish the Mock Orange Slough.
They waded in the muddy cool water up to their waists, ... . On their first pass they got a bucketful of bluegills and a small catfish. They wiped the mud and sticks from the net to try again.
"Every time the river floods," Paw said, "it brings us all these here treasures."
"Sho does," Bean said.
"I think it's fine," Paw went on. "I think it's right nice of the old river."[54]
This is a case about a fishin' hole, and the people who contest for it and care for it so variously, who are charged by the infinite to accept it in its ambivalence and antinomy. Such a fishin' hole is Lake Chatula in the far southwest corner of Ford County which
in the spring ... hold[s] the distinction of being the largest body of water in Mississippi. But by late summer the rains were gone, and the sun would cook the shallow water until the lake would dehydrate. Its once ambitious shore lines would retreat ..., creating a depthless basin of reddish brown water.[55]
James Dickey has spoken of this connection between person and place, between man and a lake that once

 ... was deep flashing 
 Tiny grid-like waves wire-touched water 
 No more, and comes what is left
 Of the gone depths duly arriving
 Into the weeds belly-up:
 one carp now knowing grass
 And also thorn-shucks and seeds
 Can outstay him:
 * * * * *
 A hundred acres of canceled water come down
 To death-mud shaking
 Its one pool stomach-pool holding the dead one diving up
 Busting his gut in weeds in scum-gruel glowing with belly-white
Unhooked around him all grass in a bristling sail taking off back-blowing.
 Here in the dry hood I am watching
 Alone, in my tribal sweat my people gone my fish rolling
 Beneath me and I die
 Waiting will wait out
 The blank judgment given only
 In ruination's suck-holing acre wait and make the sound surrounding NO
 [Poem continued on page 493]
*493 Laugh primally: be
 Like an open-gut flash an open underwater
 eye with the thumb
 pressure to brain the winter-wool head of me,
 Spinning my guts with my fish in the old place,
 Suffering its consequences, dying,
 Living up to it.[56]
Beulah Crevasse is but ninety-two acres of not yet cancelled water, and to those who war so over it Dickey seems to say that, if you like it when it is beautiful and serene and full of life, you must accept it  love it  equally when it has been taken away by nature and become but a mudhole with a dead carp in it, or when it has been taken by man, by the social invention he calls law. Dickey had these in mind when he said of such waters
[Y]ou have to accept the "gone depths" as well as the real depths that used to be there when the lake was whole, the dead fish as well as the live ones, the repulsive aspects of the scene as well as the beautiful ones that have disappeared: and if you are left with "ruination's suck-holing acre" it is your due: you know this and accept it, even with a kind of exultation, because the bond between you and the lake still exists no matter what, and you can therefore "laugh primally," maybe no better than the dead belly-up fish but still, like he, in the old place, where you both belong, and know it.
We are informed by these thoughts, knowing that law is about life, that law is not an end but a means to the end of a society in which all should want to live, with its paradox and ambiguity, its irony and contrariety even that the law has wrought. We proceed to our institutional responsibility: the right interpretation and application of our law regarding rights to these waters.

III.
Named Plaintiffs include the heirs of Walter Sillers, specifically his widow, Lena R. Sillers, who died in 1983 after suit was filed, Mary S. Skinner, Evelyn S. Pearson, Lilian S. Holleman, John L. Pearson, Evelyn P. Weems, Vernon W. Holleman, Sr., and Florence H. Schoenfeld. Alice K. Jones, the widow of Roy Jones, is a named Plaintiff, as is the Merigold Hunting Club, Inc., a Mississippi corporation. These are the parties who have brought this action, and in the main we call them "Landowners".
Landowners' contestants  Defendants below and Appellants here  are fishermen. Walter Allen Ford grew up and lived but a few miles from Lake Beulah. He fishes commercially, the tools of his trade trot lines, nets and a small outboard motor boat. He fishes for "rough fish"  buffalo, catfish, gar. And so of the Dycuses and Charley Allen. They fish mainly at night.[57]
At the center is the Merigold Blue Hole, formally though erroneously known as the Beulah Crevasse,[58] and a remarkably good *494 fishing hole in western Bolivar County, about six miles below Rosedale, covering in the main some ninety-two acres, a map of which appears as Appendix A. To the north and west a chute 112 feet wide from treeline to treeline and 192 feet from top bank to top bank runs to the southern end of Lake Beulah, an oxbow lake some six to seven miles long. In the chute connecting crevasse and lake the water is ten feet deep six to eight months a year.
West of the southwestern end of the oxbow, and somewhat northwest of the Crevasse, a drain traverses some two miles of wooded lands, connecting Lake Beulah to the Mississippi River. A dam or plug lies across the drain, built to help maintain the water level in Lake Beulah. There is a washout around the dam and small boats may pass from the River to Lake Beulah and back again at some river stages. Water roughly four feet deep often runs down the drain or chute.
The Mississippi River substantially affects the waters of Lake Beulah and the Beulah Crevasse. It generates aquatic and, more specifically, piscatorial life. The River also affects human life through its influence on water levels. When the Arkansas City Gauge measures 22 feet, water flows from the River to Lake Beulah and into Crevasse,[59] and when it reaches 31 feet the "water breaks the road on the south side of the Crevasse and flows south." Water flows in the opposite direction, from the Beulah Crevasse and Lake Beulah north to the Mississippi River even when the water level is quite low (i.e., 4.8 on the Arkansas City gauge). There is no continuous one direction flow between Lake Beulah, Beulah Crevasse or the Mississippi River. When the River rises, however, there is a southward current, and vice versa as the water recedes. There is no commercial navigation qua transportation in the area.
Even so, had it been ever thus few would doubt the public's right to enter the Beulah Crevasse by water and to fish.
But it was not always so. For one thing, in the days of Tom Sawyer and Huckleberry Finn, Lake Beulah was the River itself. The Napoleon Cutoff[60] of 1863 "straightened" the River to the west and left its old bed an oxbow that became and has remained Lake Beulah. Alluvial deposits imperceptibly created batture land south and west of the new lake where Beulah Crevasse now lies, but in those days there was no crevasse and at least as early as 1883 the land was in cultivation. Before April 16, 1912, Landowners' predecessors in title farmed this land, as by then it was protected from the River and Lake Beulah by a levee to the north and west.
The world changed on April 17, 1912, as the levee broke and the River roared through at 208,000 cubic feet per second in the eighth greatest flood in history (but still the flood 1927 has made us forget) scouring several blue holes out of the earth. When the waters receded some forty-five acres remained lakelike and covered with waters. The mighty Mississippi had destroyed much but had given birth to the Beulah Crevasse of 1912.
Still seventeen years lay before the advent of the wide chute, today joining Beulah *495 Crevasse to Lake Beulah so completely that the Dycuses and Allen and Ford insist that there is but one body of water, Lake Beulah. After the River receded in 1912 two small waterways connected Beulah Crevasse to Lake Beulah. One lay near the present chute, and not all agree regarding its dimensions nor its utility as a waterway, though the map shows it less modest than human memory suggests. A second more easterly drain appears on a map made in June of 1912 but became silted and impassable within the next eight to ten years.
By far the most persuasive evidence of the capacities of these post-flood drains is the contour map prepared by W.J. Shackelford, Chief Engineer, Mississippi Levee District, dated June 20, 1912  sixty-four days after the levee broke. That map reflects the westerly drain (the present chute) being approximately 728 north-south feet in length, ranging in width from approximately 100 feet at either end narrowing to about 78 feet at its center.[61] Its depth from top bank to bottom is some fourteen to fifteen feet. The easterly drain appears about 416 feet long. It is around 130 feet wide at its opening to Lake Beulah, narrowing to some 78 feet wide near its center and opening again to some 104 feet at its entrance to the Crevasse. Its top bank to bottom depth is about seven to eight feet. With all of this detail, the most critical facts are missing, as water levels are not shown on the Shackelford map.
Landowners produced a 1925 hydrographic-topographic survey map published by the Mississippi River Commission reflecting great and ultimately outcome determinative changes had occurred since 1912. The easterly drain from crevasse to lake had disappeared while the westerly one had greatly narrowed. This map appears as Appendix C. Beyond this Landowners brought forth anecdotal evidence in the form of three old-timers who testified that, as children, they played, visited, hunted and fished in the area. No one remembers the easterly drain, and the oldest takes us back to the present chute only to 1921, when he recalls but "a small ditch, disk shaped, sloping banks, maybe 12 feet wide at the top, taken down to the bottom. Willow trees grew all up in it. In the middle was a small ditch, maybe a foot of water running during normal times." He told of having to drag a small boat from Lake Beulah across the land to the Crevasse because there was not enough water to float. In the spring, however, the ditch would swell with water and one could navigate the chute from Lake Beulah to the Crevasse.
Landowners offered objective evidence through Austin B. Smith, a renown potamologist, who reviewed the relevant River gauge readings and testified that there "was no communication" between Lake Beulah and Beulah Crevasse. Smith's opinion is quite consistent with the 1925 MRC map. Smith conceded the public record reflects a chute fifty feet wide and ten feet deep shortly after the crevasse in 1912, evidence that approaches what is shown on the Shackelford map. Smith's testimony reflects a considerable though imperceptible evolution in the area from 1912 until 1925 and, as well, 1929 whose importance will presently appear.
The Dycuses and their companions relied on objective evidence. Their expert, Brian Winkley, did not offer an opinion as to the width or depth of the chute created by the 1912 flood, but did offer evidence that flooding occurred fifteen times in the ensuing 17 years, i.e., high water marks were reached frequently, suggesting much more of a waterway between the Beulah Crevasse and Lake Beulah than Landowners concede.
The Great Flood of 1927 made manifest the need for new levees and two years later the U.S. Army Corps of Engineers began to build a new levee east of Lake Beulah and the Crevasse. The dredging company purchased landfill from Landowners' predecessors in title and sent its dredge boat and, with a ladder cutter and suction pipe, cut a swath from Lake Beulah to Beulah Crevasse, enlarging the chute and the crevasse to near their current size. As fate *496 would have it, Austin Smith was there in 1929. "It was a very unique operation. I thought I would see it." From this bird's eye view Smith remembers
600 feet [of batture land] between the two bodies of water. There was only minor communication even in high water between the two bodies. Consequently, Beulah ... crevasse scour hole waters were actually landlocked. All except at higher stages prior to the dredging of the access channel.
The Board of Mississippi Levee Commissioners paid the then record title holders some $1,143.00 for the 76.2 acres of land taken as fill material.
No one disputes that the waters of Lake Beulah are public and anyone who wishes may fish there to his or her heart's content, subject only to the State of Mississippi's game and fish regulations which are enforceable precisely because the waters of Lake Beulah are public.[62] By the same token, for close to half a century there has been a considerable dispute regarding public access to the Beulah Crevasse.
Record title to most of what is now the lake bed of the Crevasse was in the McLemore family in 1912. In 1937 Walter Sillers bought most of the area and later sold half to Roy Jones. To this day Sillers' and Jones' heirs own the property, the boundaries of which are reflected on the map appearing as Appendix B. Several remaining acres of the Crevasse to the west and near the chute are owned by the Anderson-Tully Company, which has apparently had its fill of litigation over the years, and, parting waters with the Sillers, was not involved in this action. The Merigold Hunting Club, Inc. leases the hunting, trapping, fishing, ingress and egress rights from the remaining plaintiffs. It appears this relationship has existed since 1921, at least with the Landowners' predecessors in title.
Over the years these parties have employed a variety of stratagems to exclude the general public from the Crevasse. They have placed pilings and wire fences across the chute linking the Crevasse to the lake. They have posted the entrance to the chute. They have had the Hunting Club's caretaker deputized, a common practice up and down the River, and have arrested and prosecuted numerous "trespassers". Indeed, a long time Bolivar County prosecuting attorney is a life member who said below that he had prosecuted between fifty and one hundred people for "trespassing" in the Crevasse.
Landowners find significance in Disclaimer No. 881 given by the State Land Commissioner, the import of which is that the State of Mississippi claims no interest in certain lands which include by legal description the Beulah Crevasse. Walter Sillers[63] sought and obtained this Disclaimer in 1938, a year after he bought the property. Of course, no one denies Landowners' record title to the bed of the Crevasse, only their right to exclude the public from fishing its waters. Disclaimer No. 881 makes no reference to such waters. That Landowners pay no taxes on the Crevasse is interesting but similarly unpersuasive.
The year 1950 saw litigation not wholly unlike today's. On September 13 of that year, in an action styled Merigold Hunting Club, et al. v. Paul Avant, et al., Docket No. 5198, the Chancery Court of the First Judicial District of Bolivar County held that the hunting club was "the lawful owner of the exclusive right and privilege to hunt, fish and trap wild game and fish on said lands and waters thereon... ." None of today's defendants  the Dycus family, Allen or Ford, nor the members of the general public, were parties to that action, which insofar as the record reflects, hardly quieted anything.
Today's chapter begins in the spring of 1983 when Jimmy and Roger Dycus were caught in the crevasse and arrested. On April 29, 1983, a Bolivar County jury found Jimmy and Roger not guilty of trespass charges. This served only to enhance the frustrations of Landowners and the Hunting *497 Club who soon thereafter  on May 11, 1983, to be exact  brought the present action in the Chancery Court of the First Judicial District of Bolivar County to quiet and confirm the title they claim in and to the Beulah Crevasse, and by injunction to exclude all others from the waters of the Crevasse. The Dycus family, Charley Allen, Allen Ford and, as well, the world were named as defendants, the named parties among whom promptly counterclaimed and sought to enjoin the Landowners and the Hunting Club from interfering with their right of ingress and egress through the chute and into the Beulah Crevasse and to fish its waters, always afloat.
The Chancery Court heard the case on September 12, 1984, and in due course entered final judgment, with findings of fact and conclusions of law, favoring Landowners and the Hunting Club and denying Dycus' counterclaim.
Amplifying the facts recited above, the Chancery Court further found:
1) The waters of Lake Beulah and the Crevasse are ponded waters which means that they are calm and at rest unless water is in from the Mississippi River. The Crevasse has no natural flow or channel. When waters enter the Crevasse through Lake Beulah from the Mississippi River, the waters flow in one direction and when high water recedes the waters flow back to the River in the opposite direction. Therefore, the Crevasse is not a natural flowing stream, a river, creek, or bayou, but is a lake or ponded waters. But, "waters from the Mississippi River flow in to the Beulah Crevasse for more than 30 days out of each calendar year."
2) Lake Beulah, the Beulah Crevasse and the chute connecting the two have sufficient depth, width and length of water for more than thirty consecutive days in the year for the floating, but not navigation, of a steam boat with a carrying capacity of two hundred bales of cotton. A steamboat with a carrying capacity of two hundred bales of cotton would have difficulty navigating in and out of the Crevasse from Lake Beulah at low water stages and a modern day barge could not navigate in and out of the Crevasse from Lake Beulah as they presently exist at any water stage. There is nothing to prevent fish from swimming from the Mississippi River, to Lake Beulah, to the Beulah Crevasse and back again.
The Court made no direct findings regarding the geophysical state of these waters in the days and months immediately pre-1929, a point of importance as will presently appear.
The Dycuses, Allen and Ford appeal and ask that the Court reverse and declare a public right of access to the waters of the crevasse.

IV.

A.
Property, a creation of law, does not arise from value, although exchangeable,  a matter of fact. Many exchangeable values may be destroyed intentionally without compensation. Property depends upon exclusion by law of interference, ... .
International News Service v. Associated Press, 248 U.S. 215, 246, 39 S.Ct. 68, 75, 63 L.Ed. 211, 223 (1918) (Holmes, J., concurring).
No one denies that the Sillers and Jones families and Anderson-Tully Company own record title to the lands upon which the waters rest. Conversely, Landowners and the Merigold Hunting Club admit too much (though we exact no penalty) when they "make no claim to ownership of the waters in the Crevasse  water being unsusceptible to ownership,"[64] nor do they claim title to or ownership of any interest in the fish. What is at issue is whether Landowners by virtue of their record title to the water bottoms, and the Hunting Club by its hunting and fishing lease, enjoy thereby any right to exclude others from placing their boats in the concededly public waters of Lake Beulah and traversing the chute and on to the waters of Beulah Crevasse and fishing therein, always afloat.
Settled law sets our context.
At the time of statehood, the United States created two great public trusts *498 and conveyed to each new state, including the State of Mississippi, lands to be held by the state for the public purpose... . The second trust, the one with which we are concerned today, had placed within it the tidelands and navigable waters of the state together with the beds and lands underneath same. See State ex rel. Rice v. Stewart, 184 Miss. 202, 234, 184 So. 44, 51 (1938). In each instance the federal sovereign, in recognition of public concerns which seem to override mere private interests, granted to the state fee simple title in certain properties to be held by the state for the benefit of all of its people.
Cinque Bambini Partnership v. State, 491 So.2d 508, 511-12 (Miss. 1986), aff'd sub nom. Phillips Petroleum Company v. Mississippi, 484 U.S. 469, 108 S.Ct. 791, 98 L.Ed.2d 877 (1988); reh. den. 486 U.S. 1018, 108 S.Ct. 1760, 100 L.Ed.2d 221 (1988).
Fishing was prominent among the federal sovereign's public purposes in withholding from private ownership trust lands and waters. Phillips Petroleum, 484 U.S. at 476, 108 S.Ct. at 795, 798, 799, 98 L.Ed.2d at 885, 889, 890; Shively v. Bowlby, 152 U.S. 1, 57, 14 S.Ct. 548, 569, 38 L.Ed. 331 (1894); Hardin v. Jordan, 140 U.S. 371, 381, 11 S.Ct. 808, 811, 35 L.Ed. 428 (1891); Smith v. Maryland, 59 U.S. (18 How.) 71, 75, 15 L.Ed. 269 (1855); Martin v. Waddell's Lessee, 41 U.S. (16 Pet.) 367, 412-14, 10 L.Ed. 997, 1013 (1842). The State of Mississippi as well has long identified fishing as among the uses to which public waters have been and shall forever remain dedicated. Cinque Bambini, 491 So.2d at 512, 515; Treuting v. Bridge and Park Commission of City of Biloxi, 199 So.2d 627, 632 (Miss. 1967); State ex rel. Rice v. Stewart, 184 Miss. 202, 231, 184 So. 44, 50 (1938); see also Miss. Laws ch. 361, § 1 (1972).
History has produced anomaly in Mississippi's public trust. Almost a century passed before the nation perceived that navigable freshwaters were included, as well as tidelands and tidewaters. Shively v. Bowlby, 152 U.S. 1, 14 S.Ct. 548, 38 L.Ed. 331 (1894); Barney v. Keokuk, 94 U.S. (4 Otto) 324, 338, 24 L.Ed. 224 (1876). Long before this Mississippi law had provided, notwithstanding the public right to the waters and their surface, that the beds of navigable freshwater rivers, lakes and streams were susceptible of private ownership. Cinque Bambini, 491 So.2d at 517; State Game and Fish Commission v. Louis Fritz Co., 187 Miss. 539, 563, 193 So. 9, 11 (1940); Morgan v. Reading, 11 Miss. (3 S. & M.) 366, 399 (1844). Mississippi's view of the private property rights of riparian landowners has become firmly established and widely recognized, Archer v. Greenville Sand and Gravel Co., 233 U.S. 60, 67-69, 34 S.Ct. 567, 569, 58 L.Ed. 850, 853 (1914); Hardin v. Jordan, 140 U.S. 371, 381, 11 S.Ct. 808, 35 L.Ed. 428, 433-34 (1891), despite public ownership of the tidelands. Cinque Bambini, 491 So.2d at 517; State, ex rel. Rice v. Stewart, 184 Miss. 202, 223-28, 184 So. 44, 47-49 (1938). Equally well settled, record owners of the beds and bottoms of navigable freshwaters have no right to exclude others from the waters' surface.
Though settled at statehood the public trust has proven dynamic at three points. Our legal language has evolved. What the state holds in trust for the people was once labeled tidewaters and lands within the ebb and flow of the tide, and then navigable waters, Cinque Bambini, 491 So.2d at 513-16. Downes v. Crosby Chemicals, Inc., 234 So.2d 916, 919-20 (Miss. 1970), urges a public-private dichotomy, begging the question by what criteria we may determine which is which. Second, the trust's purposes have evolved as human needs have evolved and as the public welfare has demanded, Cinque Bambini, 491 So.2d at 512, though fishing  whether for food, commerce, sport or recreation  has always been recognized and respected.
Over the years the legislature has provided an evolving definition of navigability,[65] though the legal touchstone has been *499 and remains navigability in fact. Culley v. Pearl River Industrial Commission, 234 Miss. 788, 812, 108 So.2d 390, 398 (1959). And when that definition is fleshed out to mean "capable of being navigated by substantial commercial traffic," Downes, 234 So.2d at 919, surely no one will suggest exclusion of the navigation of commercial fishermen because their craft are customarily (though not always) smaller than the vessels of common and private carriers of cargo and passengers. See Smith & Hambrick v. Fonda, 64 Miss. 551, 554, 1 So. 757, 758 (1887), considering whether Red Creek was a "navigable or floatable stream" for purposes of "transportation of logs."[66]See also State v. McIlroy, 268 Ark. 227, 234-38, 595 S.W.2d 659, 663-65 *500 (1980); State ex rel. v. Newport Concrete Co., 44 Ohio App.2d 121, 127, 336 N.E.2d 453, 457 (1975).
Our cases further define navigability in terms of the natural state of our waterways, Downes, 234 So.2d at 920; Smith & Hambrick, 64 Miss. at 554, 1 So. at 758, and thus incorporates into the law of the public trust a third dynamic force, that of nature. Cinque Bambini, 491 So.2d at 519-20. Rivers shift imperceptibly through accretion and reliction, or violently through flood or avulsion, and where their channels change their bottoms silt in and lose their depth. Some of the legal consequences of such changes have been settled. An avulsion does not alter title to lands or minerals, nor indeed state sovereignty, Mississippi v. Arkansas, 415 U.S. 289, 291, 94 S.Ct. 1046, 1047, 39 L.Ed.2d 333, 336 (1974); Arkansas v. Tennessee, 397 U.S. 88, 89-90, 90 S.Ct. 784, 25 L.Ed.2d 73, 75 (1970); Anderson-Tully Company v. Franklin, 307 F. Supp. 539, 541-42 (N.D.Miss. 1969); Anderson-Tully Company v. Walls, 266 F. Supp. 804, 812 (N.D.Miss. 1967); Cinque Bambini Partnership v. State, 491 So.2d 508, 520 (Miss. 1986); Sharp v. Learned, 195 Miss. 201, 215, 14 So.2d 218, 220 (1943), but the public right to waters formed by an avulsion is as great as any other public waters.
The point is of importance and worth a pause. It is illustrated by the Mississippi River's (in years past) not unfamiliar avulsive cutoffs causing a change of channel. Land on the east side of the thalweg one day may on the next find itself on the west. Neither record title nor state sovereignty is altered. Yet no one doubts the right of the public  the bargeline, the commercial fisherman, the weekend pleasure boater or some latter day Huck Finn  to use the waters of the new channel as fully as the old, though those waters rest and flow upon bottoms still owned by the pre-avulsion record title holder. If, for (admittedly farfetched, though pointedly illustrative) example, the flood and levee break of April 17, 1912, had resulted in the River changing its course so that its main channel included the area now covered by the Crevasse, we are confident Landowners would not think their record title afforded a right to exclude the public from the surface of those waters any more than the residents of the late, lamented Napoleon, Arkansas, a hundred and twenty-five years ago, had by virtue of their record titles any right to exclude the public from the River that roared through and ruined their little town in 1863  the Napoleon Cutoff. By the same token, had the flood of 1912 left the Crevasse and chute in their current condition, Landowners and the Hunting Club would enjoy no right to exclude the public.
Under these settled views, Landowners (and Anderson-Tully) own the bottoms of the Crevasse as fully today as their predecessors prior to 1912. If oil, gas or other minerals were discovered beneath the beds of the Crevasse, they would belong to the record title holders as their interests may appear, and this notwithstanding that the waters may be regarded as navigable or otherwise public. Cinque Bambini Partnership v. State, 491 So.2d 508, 517 (Miss. 1986); Archer v. Levee Commissioners, 158 Miss. 57, 62, 130 So. 55, 56 (1930); The Steamboat Magnolia v. Marshall, 39 Miss. 109, 120-22 (1860); Martin v. O'Brien et. al., 34 Miss. 21, 36 (1857); Morgan v. Reading, 11 Miss. (3 S. & M.) 366, 399 (1844). Yet this stops short of telling us whether the waters of the Beulah Crevasse are private so that Landowners may of right exclude the public therefrom.
The parties have stipulated that the waters of Lake Beulah itself are public, but the reasons why this is so need be stated. Simplistically one could say that Lake Beulah is an oxbow lake and all oxbow lakes are public.[67]State Game and Fish Commission v. Louis Fritz Co., 187 Miss. 539, 193 So. 9 (1940) (Horn Lake in DeSoto County). Q.E.D. Each person who can *501 without trespass reach the waters of an oxbow lake may of right fish there to his heart's content, subject only to a like use by others, State Game & Fish Commission, 187 Miss. at 564, 193 So. at 11; cf. Hall v. Wood, 443 So.2d 834, 838-39 (Miss. 1983), and reasonable regulation by the state.
But there is more to the matter. These oxbow lakes by definition were once a part of the River. The Act of Congress authorizing formation of this state provided:
that the River Mississippi, and the navigable rivers and waters leading into the same, ..., shall be common highways, and for ever free, ... .
3 Stat. 348, 349 (1817). Until 1863 what is now Lake Beulah served as the main channel of the River and was surely public prior to that time.
The avulsive Napoleon cutoff did not destroy the public character of those waters. To be sure, the River has made substantial deposits of silt in the northwest end of Lake Beulah and batture land has arisen wholly cutting off access from the North. Those areas where land now lies where the River once flowed are no longer public. But Lake Beulah still communicates with the River at its southwest end and indeed the River's freshwaters are the source of the public value of Lake Beulah (and as well Beulah Crevasse). It is public in the sense that either federal or state government would have authority to "improve" Lake Beulah and the drain connecting it to the River to make it much more navigable than it is today, as navigable as it once was,[68]United States v. Appalachian Power Co., 311 U.S. 377, 404-410, 61 S.Ct. 291, 297-301, 85 L.Ed. 243, 250-254 (1940); Shively v. Bowlby, 152 U.S. at 33-34, 14 S.Ct. at 560-61, 38 L.Ed. at 344. Withers v. Buckley, 61 U.S. (20 How.) 84, 92-93, 15 L.Ed. 816, 820 (1857); affirming Commissioners of Homochitto River v. Withers, 29 Miss. 21, 37-40 (1855); Culley v. Pearl River Industrial Commission, 234 Miss. 788, 811-12, 108 So.2d 390, 398 (1959), and we inquire not into the current desirability of doing so. Our constitution empowers the state to remove obstructions upon "navigable waters ... whenever the public welfare demands". Miss. Const. Art. 4, § 81 (1890). And when so improved such waters may be used by the public to the extent the improvements allow. But see Kaiser Aetna v. United States, 444 U.S. 164, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979) (waters remain private after improvements because under state law they were privately owned before improvements).
There is a second  and independent  reason why Lake Beulah is public: the doctrine of prescription. Where the public has enjoyed access to waters for in excess of ten consecutive years, those waters belong to the state by adverse possession, to be held in trust for the people. Cf. Miss. Code Ann. § 15-1-13 (1972); see generally Clark, ed., Waters and Water Rights § 38.2(A) (1967). Under this view oxbow lakes formed before statehood and, as well, other waters used by the public under a claim of right, openly, notoriously, peacefully, continuously and uninterruptedly for in excess of ten years become public,[69] and, once public, such waters may not be lost by prescription. Cinque Bambini, 491 So.2d at 521.
Landowners' "concession" that they have no claim to the waters of the Crevasse would follow only if those waters be public, as are the waters of Lake Beulah proper, for this Court was speaking of public waters when it said that "[i]n its ordinary or natural state water is neither land, nor tenement, nor susceptible of absolute ownership. It is a movable wandering thing *502 and admits only of a transient, usufructuary property," State Game and Fish Commission v. Louis Fritz Co., 187 Miss. 539, 563, 193 So. 9, 11 (1940); see also The Steamboat Magnolia v. Marshall, 39 Miss. 109, 124-25 (1860). Louis Fritz Co. as well spoke of public waters when the Court held that owner of the beds of navigable waters "may not say that he has any sole ownership in that part of the water which rests upon his lake bed, for the unity of a lake is preserved not only by all parts of its entire bottom but also by all its banks, as to which other riparian owners contribute an essential part to the maintenance of the whole." Fritz, 187 Miss. at 563, 193 So. at 11; see also Anderson-Tully Co. v. Tingle, 166 F.2d 224 (5th Cir.1948); Xidis v. City of Gulfport, 221 Miss. 79, 90, 72 So.2d 153 (1954).
To further beg the question, neither would the fish in the public waters be susceptible of private ownership until captured in fact. In Ex Parte Fritz, the Court said:
Fish are ferrae naturae. They are incapable, until actually taken, of absolute ownership, except in artificial lakes or in small ponds that are entirely land locked. (Emphasis supplied).
86 Miss. at 217, 38 So. at 723. In State v. Hill, 98 Miss. 142, 53 So. 411 (1910), a similar remark is found.
The title [to fish] is in all the inhabitants in the state, and no person can acquire any absolute title, as against all others, except by capture and subjection to his own control.
98 Miss. at 148, 53 So.2d 412. See also State v. Buckingham, 93 Miss. 846, 853, 47 So. 501, 502 (1908); Pierson v. Post, 3 Caines (N.Y.) 175 (1805); State v. Shaw, 67 Ohio St. 157, 65 N.E. 875, 875 (1902).
But not all waters nor all fish swimming therein are public, as noted in Ex Parte Fritz, 86 Miss. at 217, 38 So. at 723. Cinque Bambini makes clear that "artificially created water courses, inlets, slips, marinas and the like, ... [and, as well,] physical improvements or alterations thereto upon lands theretofore private under state law remain private," the salt content of the waters notwithstanding. Cinque Bambini, 491 So.2d at 520; Kaiser Aetna v. United States, 444 U.S. 164, 179, 100 S.Ct. 383, 392, 62 L.Ed.2d 332, 346 (1979). Easiest are the now familiar catfish ponds, wholly man-made, which dot the Delta and into which fingerlings are placed, fed, raised and harvested, at all times privately owned by reason of the law of property. Where a lake or pond is wholly man-made or "artificial", the record title holders own the waters and all life within them as their interests may appear, Black v. Williams, 417 So.2d 911, 912 (Miss. 1982), whether the lake or pond has been built for commercial, drainage, recreational or aesthetic reasons. By the same token, our law protects from interference a record titleholder's interest in small, completely landlocked natural (spring fed) lakes. Were Beulah Crevasse entirely landlocked and had it been so since 1912, Landowners of right could exclude all others from access to the surface waters.
Cinque Bambini left aside "claims of navigation, ingress and egress" en route to holding that "neither artificially created water courses, inlets, slips, marinas and the like" remain privately owned though tidally affected. Cinque Bambini, 491 So.2d at 520. Claims of a public right of access and fishing were not before us there. Still the principle at work in Cinque Bambini seems sufficient that small artificial man-made bodies of water upon lands theretofore private remain private, and as well small, naturally created ponded bodies of water by human means made accessible from public waters.
We described above the contours and characteristics of Beulah Crevasse and the chute leading to Lake Beulah and suggested that if it had been ever thus there could be no doubt that access to the waters of the Crevasse was available to the public. We are not at liberty to so view the matter, as our law ascribes great consequence to how what now is came to be.
If the Crevasse and chute had been entirely made by man, title thereto and the right to exclude others from the surface waters would reside in the owners of record. Black v. Williams, 417 So.2d 911, *503 912 (Miss. 1982); see also Vaughn v. Vermillion Corp., 444 U.S. 206, 100 S.Ct. 399, 62 L.Ed.2d 365 (1979). This would not be true if the Crevasse and chute of today had been created entirely by a natural though avulsive process, as we have noted above. An avulsion may leave undisturbed title to lands or minerals, and indeed state sovereignty, Mississippi v. Arkansas, 415 U.S. 289, 291, 94 S.Ct. 1046, 1047, 39 L.Ed.2d 333, 336; Cinque Bambini, 491 So.2d at 520; but the public right to waters formed by an avulsion is as great as any other public waters.

B.
The legal principles before us, we must apply them to the facts. See Boardman v. United Services Automobile Association, 470 So.2d 1024, 1029-30 (Miss. 1985). Our focus turns to the Flood of 1912 and, more pointedly, the flood's wake. Had the Crevasse been completely landlocked once the floodwaters receded so that neither fish nor fisherman could by water enter from Lake Beulah or by water exit the Crevasse, and had things remained so until 1929, the case would be easy. Landowners would win. Conversely, had the Flood of 1912 washed away the levee and merely expanded Lake Beulah a mile or so to the south, covering the entire of the Crevasse as shown on the Shackelford map of June 1912 and, as well, what lay between the Crevasse and lake so completely that the first time observer of the map or water would regard them as one, and had things remained so thereafter, the case would be easy. Landowners would lose. Thus our point of beginning becomes whether, once the waters receded in the summer of 1912, the Crevasse as the forces of nature had left it was legally a separate body of water, a point turning on whether the two chutes or drains leading from Lake Beulah to the Crevasse were at that time capable of supporting substantial navigation by commercial fishermen for the better part of the year. Downes v. Crosby Chemicals, Inc., 234 So.2d at 920; Smith & Hambrick, 64 Miss. at 554, 1 So. at 758.
The Chancery Court made no finding on the point and the evidence is less than crystal clear. The dimensions of the two chutes as they appear on the Shackelford map, coupled with the fact that there was another major flood in 1913, though not so great as that of the year before, suggest quite likely the waters of the chutes were sufficient that the waters of the Crevasse were then public. But this only begins our inquiry as nature in its brutal neutrality may give and take away almost willy nilly. See 101 Ranch v. United States, 714 F. Supp. 1005, 1014 (D.N.D. 1988). Except for the avulsion exclusion above noted, the law leaves title holders at nature's risk and the State of Mississippi is as much at risk as any private landowner.
What is critical  and outcome determinative  is the state of the watercourses connecting the Crevasse and Lake Beulah immediately prior to the 1929 artificial enlargement of the chute and the Crevasse.
The Chancery Court made extensive findings of fact regarding (non)navigability of the chute. The problem is that these findings are not tied to any particular point in time, this in the face of the certain though imperceptible evolution of geophysical reality over the seventeen years from 1912 to 1929. In such a setting we hesitate to employ the familiar substantial evidence rule. See Leatherwood v. State, 539 So.2d 1378, 1387 (Miss. 1989) (substantial evidence/manifest error rule applies only where "trial judge applied the correct legal standard in making his finding"); McLendon v. State, 539 So.2d 1375, 1377 (Miss. 1989) (same); Burkett v. Burkett, 537 So.2d 443, 446 (Miss. 1989) (same; trial court exercise of discretion). Instead, we review the evidence to see whether we may find with confidence the state of things immediately before 1929, or whether we should remand for further findings under the principles of law articulated above.
For one thing, the 1925 survey map published by the Mississippi River Commission makes clear that Shackelford's 1912 easterly drain has vanished, at least 500 feet of land separating the Crevasse from Lake Beulah. The 1925 map reflects the westerly drain, but narrowed considerably from *504 what it once was. Assuming accuracy of the map's scale, the chute would not be more than ten to twenty feet wide. Its depth and water levels are not given.
Austin Smith's personal observations of the conditions existing in 1929 at the time of the dredging powerfully support a non-navigability conclusion. Smith's analysis of River gauge readings suggests that in the last years before 1929 the waters between the Crevasse and Lake Beulah communicated only when the River was at flood stage. Immediately prior to 1929, the Beulah Crevasse was a separate and distinct body of water from Lake Beulah, and the Court below found "the communication of the waters [since 1929] is the direct result of the manmade outlet between the Crevasse and Lake Beulah created by the Corps of Engineers dredging."[70]
We have indicated above that the Shackelford map calls into serious question the suggestion that the waters of the Crevasse and Lake Beulah did not communicate shortly after the Flood of 1912 and in the few years thereafter. However, the 1925 map together with the eye-witness testimony offered by Landowners and the Hunting Club leave us without doubt that in the days immediately pre-1929 the chute was non-navigable. Likewise, the evidence is clear that the navigability of the chute is directly attributable to the Corps of Engineers' 1929 dredging operation, an artificial source. We find the evidence essentially uncontradicted that, in the days just before 1929, there was so little water in the chute one could step across it. From this we derive the ultimate fact that, immediately prior to the 1929 dredging operation, Lake Beulah and the Beulah Crevasse did not communicate and were separate bodies of water, and upon this rock today's appeal founders.

V.
The Dycuses, Allen and Ford argue further that reversal is required because of a brief, mid-trial social visit between one of the Landowners, Circuit Judge John L. Pearson, and Chancery Judge Harvey Ross, the trial judge. Judge Pearson introduced his son to Judge Ross. The matter was thoroughly explored before another Chancery Judge who found no impropriety. On its facts this case is a far cry from the likes of Jenkins v. Forrest County General Hospital, 542 So.2d 1180 (Miss. 1988). We perceive no reason to reverse.
AFFIRMED.
ROY NOBLE LEE, C.J., HAWKINS and DAN M. LEE, P.JJ., and PRATHER, SULLIVAN, ANDERSON, PITTMAN and BLASS, JJ., concur.
ROY NOBLE LEE, C.J., files separate concurring opinion, joined by SULLIVAN and PITTMAN, JJ.
*505 
*506 
*507 
*508 ROY NOBLE LEE, Chief Justice, concurring:
I concur with the expressions and conclusions on the law of this case stated by my colleague and panel member, but with some concern.
In Cinque Bambini Partnership v. State, 491 So.2d 508 (Miss. 1986), public lands and public rights were established in 1817, when Mississippi became a state of this Union. Her boundaries were measured where the tide ebbed and flowed, affecting thousands of acres of land and countless people to our present generation.
The Mississippi River has flowed through Mississippi for eons  as long as the tides ebbed and flowed. As the sea tides flowed and breathed life onto and into the marshes and wetlands of the Mississippi Gulf Coast, likewise has the Mississippi River performed in this state from the Tennessee line to the Gulf of Mexico. The River takes land and makes land at its whim (floods). With all accumulated science, study and knowledge, the Corps of Engineers cannot control the River for long.
The "fishing hole"  Beulah Crevasse  was created by the Mississippi River. It is a child of its father  the Father of Waters  born by the flood of 1912, grown up by the subsequent floods of the teens and early twenties, and matured by the great flood of 1927. The River took the land of the appellees.[1] The River nourished the place it took, supplied it with river life and aquatic inhabitants of all kinds, and made it what it is today.
My concern in this case is that the Beulah Crevasse is still a part of the Mississippi River. The River has flowed into, and generated life in, the Crevasse every year since the River created it. The Crevasse is an appendage of Lake Beulah (nobody disputes that Lake Beulah is public). The River flows through Lake Beulah and the Crevasse at the same flood stages and renews life in them equally. Then why should not a fisherman, commercial or sport, be permitted to run his boat from over the waters of the Mississippi River, into Lake Beulah, thence into the Beulah Crevasse, all without treading upon any person's land?
Over hundreds of years, the River has changed course during floods. A landowner in Mississippi, Louisiana and Arkansas would lose forty, eighty, one hundred acres or more after the River receded to its new bed, while the landowners on the other side of the river gained land. The pattern has existed from time immemorial. "Ole' man River  he giveth and he taketh away  and he keeps on rollin' along." So with the Beulah Crevasse.
My concurrence with the decision in this case is based on the fact that the Corps of Engineers also worked upon and opened the chute from Lake Beulah to the Crevasse in 1929 and, thus, the chute was also manmade and was water connected year round. I am still mindful of the fact that the River, even without the artificial removal of fill from the chute, naturally flowed through the chute during flood stage. I cannot say that the lower court was manifestly wrong in holding that the work done by the Corps of Engineers tipped the scales in favor of the appellees, although as a trial judge, I may have found differently.
My second concern has been the effect that this decision may have on other oxbow lakes along the Mississippi River, Pearl River and lesser tributaries. I strongly concur with the majority opinion in that they will not be affected, and that this case will not be precedent in an attempt to destroy them as public bodies. As people increase, land, fishing holes, hunting grounds, woods, outdoors decrease. Companies, clubs, and wealthy individuals acquire our natural and beautiful areas. They must be preserved as best can be done for all our people.
Finally, I have never attempted to edit the opinions of my colleagues on this Court. However, in my view, the first *509 twelve pages of the majority opinion would best have been left unsaid, or relegated to a work of prose or fiction. The Bench and Bar have much law and many opinions to read and digest and should be permitted to choose when and where to read for pleasure.
SULLIVAN and PITTMAN, JJ., join this opinion.
NOTES
[1] More often than we dare or can admit, law's lame language cannot convey the realities and mood of the matter the judge must adjudge. Compare McInnis v. State, 527 So.2d 84, 89 (Miss. 1988); City of Clinton v. Smith, 493 So.2d 331, 334-36 (Miss. 1986); Pharr v. State, 465 So.2d 294, 297-99 (Miss. 1984); see also Flood v. Kuhn, 407 U.S. 258, 260-64, 92 S.Ct. 2099, 2100-2103, 32 L.Ed.2d 728, 732-33 (1972). Today's is such a case.
[2] W. Morris, North Toward Home 75 (1967).
[3] Id.
[4] E. Welty, Losing Battles 235 (1970).
[5] Id. at 236.
[6] E. Welty, "At the Landing" in Collected Stories 243 (1980).
[7] Id. at 240.
[8] E. Douglas, "Hold On" in Black Cloud White Cloud 166 (1963).
[9] Id. at 171.
[10] W. Percy, The Moviegoer 148 (1961).
[11] Id.
[12] Strong v. Bostick, 420 So.2d 1356, 1364 (Miss. 1982), quoted in Pharr v. State, 465 So.2d 294 at 298.
[13] W. Faulkner, The Reivers 248 (1962).
[14] Id. at 249.
[15] W. Percy, The Moviegoer 149 (1961).
[16] B. Lowry, Emma Blue 34 (1978).
[17] W. Faulkner, Go Down, Moses 165, 350-51 (1942).
[18] Id. at 209.
[19] E. Welty, supra, note 6 at 251.
[20] W. Percy, The Last Gentleman 187 (1966).
[21] L. Brown, "Night Life" in Facing the Music 116 (1988).
[22] B. Lowry, Emma Blue 19 (1978).
[23] E. Welty, supra, note 6 at 248.
[24] N. Buckingham, "Jailbreak" in Game Bag, 165 (1943).
[25] E. Douglas, supra, note 8 at 171.
[26] See J. Autry, "Fishing Day" in Life After Mississippi 3 (1989).
[27] N. Buckingham, "The Sally Hole" in The Tattered Coat, 55 (1939).
[28] G. Morris, "Fishing", in Encyclopedia of Southern Culture, 1221 (1989).
[29] J. McCafferty, "White Bass Basics", in MS Outdoors 8 (March, 1983).
[30] Id. at 16.
[31] D. Berry, "Bass" in An Anthology of Mississippi Writers (Polk and Scafidel eds.) 502 (1979).
[32] Young, "Catfish" in Encyclopedia of Southern Culture, 378 (1989).
[33] M. Twain, Huckleberry Finn 60 (1885).
[34] H. Carter, Man and the River: The Mississippi 30-31 (1970).
[35] See Henshaw, "Evolution of the Kentucky Reel" in Outing Magazine.
[36] B. Haxton, "To Be a Jug Fisherman" Dead Reckoning, 84 (1989). Haxton's powerful poem reminds us of other realities of jug fishing for catfish and for life.
[37] H. Carter, supra, note 34 at 30-31 (1970).
[38] G. Morris, "Fishing", in Encyclopedia of Southern Culture, 1221 (1989).
[39] E. Douglas, supra, note 8 at p. 168.
[40] L. Brown, "The Rich" in Facing the Music 38 (1988).
[41] M. Anderson, Outdoor Observations 166 (1977).
[42] J. Seay, "Grabbling in Yokna Bottom" in Let Not Your Hart (1970).
[43] J. Autry, "Grabblin'" in Life After Mississippi 10 (1989).
[44] E. Douglas, supra, note 8, 161-62 (1963).
[45] N. Buckingham, "Over the Brook Cedron," in Ole Miss' 111 (1937).
[46] B. Hannah, "Water Liars" in Airships 5 (1978).
[47] J. Grisham, A Time To Kill 23-24 (1989).
[48] M. Anderson, Outdoor Observations 132 (1977).
[49] E. Douglas, supra, note 8, at 171; and Anderson, Outdoor Observations at 161, 163 (1977).
[50] E. Welty, "The Wide Net," in Collected Stories 181 (1980).
[51] D. Cohn, Where I Was Born and Raised 43 (1948).
[52] M. Anderson, Outdoor Observations 41 (1977).
[53] M. Anderson, Outdoor Observations 41 (1977).
[54] L. Wallin, "The Redneck Poacher's Son" in I Mississippi Writers: Reflections of Childhood and Youth: Fiction 618 (D. Abbott ed., 1985).
[55] J. Grisham, supra, note 47 at 11.
[56] J. Dickey, "Remnant Water" in The Central Motion: Poems, 1968-1979 108-109 (1983).
[57] Compare E. Welty, supra, note 6 at 243; W.A. Percy, Lanterns on the Levee 17 (1941). Cf. Kelly v. Smith, 346 F. Supp. 20 (N.D.Miss. 1972), aff'd Kelly v. Smith, 485 F.2d 520 (5th Cir.1973), (caretaker's rifle assault on trespassers on hunting club's preserve.)
[58] The linguist knows that a crevasse in life on the River refers to a breach in the top bank of the levee, not a lakelike body of water. When this happens "furious blue waters roar down the remains of the levee scouring deep holes in the earth." Daniel, Deep'n As It Come: The 1927 Mississippi River Flood 22 (1977).

Nash Buckingham's short story, "The Sally Hole" tells of one such:
Between the levee and the house lay a twenty-acre lake, formed years ago when a lower barrier broke under the strain of an overwhelming freshet and dug out a deep, somnolent "Blue Hole."
Buckingham, Tattered Coat 56 (1930). In his story of the Great Flood, Pete Daniel mocks a Corps of Engineers Colonel's dissertation on "blew holes."
Almost any inhabitant of the flooded area could have told the Colonel that it was a b-l-u-e hole because the water usually turned blue, and that it was the hole, some fifty to a hundred feet in depth, which was left when a crevasse gouged out the earth.
Daniel, Deep'n As It Come: The 1927 Mississippi River Flood, 148 (1977). For a broader perspective, see W.A. Percy, Lanterns on the Levee 244 (1941).
Our search of the judicial literature has yielded but a glancing reference to the formation of a blue hole. See Drainage District No. 48 of Dunklin County v. Small, 318 S.W.2d 497, 504 (Mo. 1958).
In this opinion we consciously misuse the word "crevasse", because the parties do, and by it refer to the body of water south of Lake Beulah left when the floodwaters receded in 1912. Indeed, the U.S. Army Corps. of Engineers labels it "Beulah Crevasse (1912)" in Flood Control and Navigation Maps of the Mississippi River, Map No. 24 (56th ed. 1988).
[59] The Mississippi River was over 23 feet on the Arkansas City gauge at least 112 days in 1984; in 1983, 76 days; in 1982, 90 days; in 1981, 34 days; in 1980, 46 days; in 1979, 148 days; in 1978, 104 days; in 1977, 54 days; in 1976, 44 days; in 1975, 148 days.
[60] For a brief description of the avulsion known as the Napoleon Cutoff, see Chicago Mill & Lumber Co. v. Tully, 130 F.2d 268, 270 (8th Cir.1942).
[61] These dimensions are easily computed by measurement of the appropriate parts of the Shackelford map, multiplied by its scale.
[62] State Game and Fish Commission v. Louis Fritz Co., 187 Miss. 539, 565-66, 193 So. 9, 12 (1940); Ex Parte Fritz, 86 Miss. 210, 217-18, 38 So. 722, 723 (1905).
[63] From 1916 until 1966, Sillers represented Bolivar County in the Mississippi House of Representatives. From 1944 until 1966, Sillers served as Speaker of the House.
[64] See Brief of Appellees, filed March 20, 1989, at p. 4.
[65] Our statute law first spoke to the point in 1840, providing

All bays, inlets, and rivers, and such of the lakes, bayous, and other watercourses as shall have been, or may be, declared to be navigable by act of the legislature or by the board of supervisors of the county in which the same may be, shall be public highways.
See Miss. Code Ann. § 51-1-3 (1972), the last form of that originally found in Hutchinson's Code, ch. 10, art. 6(1) (1848); see also Howard and Hutchinson, Miss.Stats. ch. 38, § 55 (1840). This enactment contained no definition of navigability, and was repealed in 1988. Miss. Laws, ch. 598, § 2 (1988).
As early as 1896, the legislature declared
That all rivers, creeks and bayous in this state, twenty-five miles in length, that have sufficient depth and width of water for thirty consecutive days in a year, for floating a steam boat with carrying capacity of two hundred bales of cotton, are hereby declared to be navigable waters of this State.
Miss. Laws, ch. 64, § 1 (1896). This declaration has been twice codified, first in Chapter 3 on "Construction of Statutes," Miss. Code Ann. § 1-3-31 (1972), and, second, in Chapter 51 on "Water, Water Resources, Water Districts, Drainage and Flood Control," Miss. Code Ann. § 51-1-1 (1972). In the former codification the words "and public highways" have been added at the end. These words were effectively appended to Section 51-1-1 by the next succeeding section, Miss. Code Ann. § 51-1-3 (1972), until 1988 when, as noted, that statute was repealed. Though aptly labeled "rather quaint" some thirty years ago, Culley v. Pearl River Industrial Commission, 234 Miss. 788, 811, 108 So.2d 390, 398 (1959), the declaration persists.
The legislature did not stop there, perhaps in recognition that some might think excluded all waters not expressly included and that many waters in this state long thought public do not meet this definition. When this case was tried, the statute law vested in the public "the right of free transportation ... to fish and engage in water sports" on
such portions of all natural flowing streams in this state having the length of not less than five miles and which has an average depth along the thread of the channel of three feet for ninety consecutive days in the year and which have an average width at low water of not less than thirty feet... .
Miss. Laws, ch. 361, § 1 (1972). That enactment was amended in 1988 so that the public right now extends to
Such portions of all natural flowing streams in this state having a mean annual flow of not less than one hundred cubic feet per second, as determined and designated on appropriate maps by the Mississippi Department of Natural Resources.
Miss. Laws, ch. 598, § 1 (1988), now codified as Miss. Code Ann. § 51-1-4 (Supp. 1989). This act goes on to provide that it applies only "to natural flowing streams." The definition of "navigability" or "public" for lakes and other bodies of water is not addressed.
The legislature ordinarily has the power to declare in its definitional enactments that no matter or object not expressly within its language may be brought within it, although in today's context the legislature may hardly withdraw from public use waters the federal sovereign granted the state in trust. See Cinque Bambini, 491 So.2d 508 (Miss. 1986). On the other hand, where no such exclusionary wording be found in the enactment, such should not be judicially supplied. Here we find nothing in the statutes declaring that the waters there described shall be the only waters in the state available to the public. Where statutes are in such form, the rules they embody are construed and enforced as principles and rules emanating from the common law process or any other source. Courts may and generally should bring them to bear in "situations functionally analogous." J.L. Teel Co., Inc. v. Houston United Sales, 491 So.2d 851, 857 (Miss. 1986); see also W. Gellhorn, Contracts and Public Policy, 35 Colum.L.Rev. 679, 691 (1935). Statutes such as this evoke thought of Karl Llewellyn's familiar double maxim: "the rule follows where its reason leads: where the reason stops, there stops the rule." K. Llewellyn, The Bramble Bush 189 (1960).
We know that many lakes are public but we have at present no statute declaring which lakes are, the enactments now on the books being limited to "rivers, creeks and bayous." The now repealed Section 51-1-3 includes "lakes" but provided no definition, except declaration "of the legislature or ... the board of supervisors of the county in which the same may be." Certainly nothing in the 1988 enactment or any other statute declares our many lakes heretofore thought public to be no longer so, nor could it. See Miss. Laws, ch. 59, § 3 (1988). On principle, lakes of analogous capacity  to accept a mean annual flow of one hundred cubic feet per second  are public, as are those navigable in fact. See Downes v. Crosby Chemicals, Inc., 234 So.2d at 919; Smith & Hambrick v. Fonda, 64 Miss. 551, 554, 1 So. 757, 758 (1887).
[66] See generally Annotation, Public Rights of Recreational Boating, Fishing, Wading, Or the Like in Inland Stream the Bed of Which is Privately Owned, 6 A.L.R.4th 1030, 1041-51 (1981).
[67] A sampling of the judicial experience with nature's transformation of river bends into oxbow lakes includes Nebraska v. Iowa, 143 U.S. 359, 370, 12 S.Ct. 396, 400, 36 L.Ed. 186, 190 (1892); Omaha Indian Tribe v. Wilson, 575 F.2d 620, 635 (8th Cir.1978); United States v. Rhodes, 3 F.2d 771, 772-73 (8th Cir.1925); and McGee v. Matthews, 241 F. Supp. 300, 301-304 (E.D.Ark. 1965); see also, State of Mississippi ex rel. Moore v. Marsh, 710 F. Supp. 1488, 1513 (S.D.Miss. 1989).
[68] We are not unaware that several oxbow lakes larger than Lake Beulah have been declared "non-navigable" by federal enactment. See, e.g., 33 U.S.C. § 47 (Eagle Lake); 33 U.S.C. § 59g (Lake Washington). These declarations serve only to exempt these bodies of water from the duties and responsibilities of the U.S. Army Corps of Engineers, and have no impact on today's issue.
[69] Our law well recognizes that roadways may become public by prescription. Joachim v. Villa Santini, Inc., 353 So.2d 767, 768 (Miss. 1977); Coleman v. Shipp, 223 Miss. 516, 530-31, 78 So.2d 778, 784 (1955); Armstrong v. Itawamba County, 195 Miss. 802, 814, 816, 817, 16 So.2d 752, 756, 757 (1944); compare McNeely v. Jacks, 526 So.2d 541, 544 (Miss. 1988). By analogy, waters may similarly become public.
[70] From this we might imply a finding that immediately pre-1929 the waters of the Crevasse and Lake Beulah did not communicate, and then apply the substantial evidence rule, see Knight v. McCain, 531 So.2d 590, 597 (Miss. 1988), and Tricon Metals & Services, Inc. v. Topp, 516 So.2d 236, 238-39 (Miss. 1987), were it not that the findings of fact before us make it clear that the Court never focused on that moment as distinguished from the 1912-1929 period generally.
[1] After the River took the land and covered it with water, the owners stopped paying ad valorem taxes on it.